The STATE of Ohio, Appellee,

v.

NOBLES, Appellant.*

[Cite as *State v. Nobles* (1995), 106 Ohio App.3d 246.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. CA 14480.

Decided Sept. 1, 1995.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1996), 74 Ohio St.3d 1510, 659 N.E.2d 1287.

248

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *M. Catherine Koontz,* Assistant Prosecuting Attorney, for appellee.

*Larry J. Denny,* for appellant.

FREDERICK N. YOUNG, Judge.

Tanisha Nobles was tried on two counts of a three-count indictment for the murder of her son, Erick Nobles, and for the gross abuse of his corpse. She was convicted by a jury on both counts, and by the court for the third, following her no contest plea to the charge of inducing panic. She was sentenced to incarceration for fifteen years to life in the Ohio Reformatory for Women on the murder conviction, to be served consecutively to a sentence of eighteen months for gross abuse of a corpse. A sentence of six months was imposed for inducing panic, which was to run concurrently with the other two.

There is no question that Nobles was convicted on the strength of the confession she made to Dayton homicide detectives on January 12, 1993, the culmination of nearly a week of frenetic investigation into Erick Nobles's disappearance. She related how, on December 26, 1992, while giving her son a bath, she pushed his head under the water and held it there until he stopped struggling. She then turned him over and felt for a heartbeat. When she found none, she lifted him out of the water and laid him on his bed, dried, and dressed him. She put Erick's body into a green plastic garbage bag, which she placed in his bedroom closet. A few days later, she removed Erick's body from the closet and threw it into a trash dumpster near her apartment.

Nobles brought a motion to suppress her confession, but was unsuccessful. From her subsequent conviction and sentence she brings this appeal, raising nine assignments of error. We will discuss the additional facts of this case as they are relevant to each of the assignments of error below.

## I

"The trial court's failure to take sufficient measures to avoid the adverse consequences of pretrial publicity denied appellant's right to a fair and impartial jury trial as guaranteed by the Ohio and United States Constitutions."

The media's interest in this case began with Nobles's false report of her son's abduction from the Salem Mall on January 7, 1993. That report immediately generated a number of articles in the *Dayton Daily News*, as well as local television and radio coverage. The majority of the pretrial newspaper articles appeared within one week of Erick's reported abduction, and the record reveals that the latest of them appeared on February 5, 1993. Some of the articles contained details of Nobles's confession to the killing of her son, and others of them contained statements by police officers who would later appear as prosecution witnesses. The initial spate of media attention apparently subsided after early February 1993, but peaked briefly again when coverage was permitted of Nobles's April 22–23, 1993 suppression hearing, at which the circumstances surrounding the making of her confession were examined.

In light of the probability that any potential juror in Montgomery County would have been exposed to a good deal of information about this case, and to Nobles's confession in particular, the trial court was obligated to ensure that the jurors who sat in judgment of her would not have formed an opinion of her guilt that they would be unable to set aside. Nobles alleges that the trial court did not ensure that her jury would be so impartial, specifically faulting the court for failing to grant her motion for a change of venue, for voir diring the veniremen itself on the extent of their pretrial exposure to the case and forbidding counsel to do any questioning on the issue, and for failing to adequately warn the jurors not to read, watch, or listen to anything about the case in the media while the trial was underway.

First, we note that "a decision to change venue is within the trial court's discretion. * * * An appellate court will not reverse such a decision absent a clear showing that the court abused its discretion." *State v. Herring* (1984), 21 Ohio App.3d 18, 18, 21 OBR 19, 19, 486 N.E.2d 119, 120. In making its decision, the trial court examines the totality of the surrounding facts to determine whether pretrial publicity is likely to have created such an atmosphere in the county where the charge is pending that an impartial jury cannot be seated there.

See Crim.R. 18(B). The court's best opportunity to discover the extent and the strength of any community prejudice against the accused is to attempt to seat a panel and to examine the veniremen on the issue during voir dire. *State v. Thompson* (1987), 33 Ohio St.3d 1, 5, 514 N.E.2d 407, 412. Then, "'where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue.'" *Id.*, quoting *State v. Swiger* (1966), 5 Ohio St.2d 151, 34 O.O.2d 270, 214 N.E.2d 417, paragraph one of the syllabus.

██ A voir dire examination into pretrial publicity is not deficient for failing to uncover the details of every article or broadcast to which the veniremen have been exposed. *Mu'Min v. Virginia* (1991), 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493. The voir dire conducted, whether by the court or by counsel, is sufficient if it reveals that the jurors will be able to set aside any impression they formed on the basis of pretrial publicity and to decide the case solely on the law and the evidence presented at trial. See *id.; State v. Spirko* (1991), 59 Ohio St.3d 1, 24, 570 N.E.2d 229, 254–255.

█ At a pretrial conference held February 3, 1994, the court announced that it would do all of the questioning on pretrial publicity, and that counsel was not to inquire into that issue when voir dire was turned over to them. The court invited counsel then to submit questions they would like the court to ask the veniremen, adding that the submissions did not need to be filed unless counsel wanted to do so in order to make a record. Though it seems that defense counsel did submit questions to the court, they did not file them, nor was any motion made pursuant to App.R. 9(E) to make them part of the record. They did not object during the pretrial nor during the voir dire itself either to the fact that the court proposed to conduct all of the questioning about pretrial publicity, nor to any refusal of the court to ask the questions they submitted. The court's examination of the veniremen on the issue of media coverage ran as follows:

"The events giving rise to these charges received some attention from the news media. By news media is meant the *Dayton Daily News* and the local radio and TV stations. Do any of you recall reading anything in the newspaper or hearing or seeing anything on the radio or on television concerning these events, or this defendant? Again, if your answer is yes, please raise your hand. Okay.

"Keep your hands up, or remember that your hand was up. You can take them down and I will ask you the next question.

"While not intending to be derisive of the media, do all of you understand that the media reports may or may not be totally accurate? Certainly due to the limitations of space in the newspaper and time constraints on the electronic

media, rarely are reports complete. For those of you who indicate that you remember any such matters relating to this case, do you remember specifically what you heard or saw?

"You had your hand up before. I want you to think. Do you just remember vaguely something about that or do you remember specifics? If you remember specifics, raise your hand. Okay. You can put your hands down again.

"For those of you who raised your hands on that last question, do any of you who do remember facts of this case or specifics that were reported, do any of you feel that—or do you feel that you can put aside any such recollections and not permit them to influence your decision in this case if selected as a juror? Can you decide this case solely on the evidence presented in this courtroom?

"The bottom line question is: do each of you feel that you can be a fair and impartial juror if selected as a member of this jury?

"Is there anyone who feels that he or she cannot be a fair and impartial juror if selected as a member of this jury because of something he or she may have heard or seen? Would you please raise your hand.

"From your hands being down and from your silence, then I take that to mean that all of you realize that all you can consider, if you are a juror in this case, is the evidence that's presented in this courtroom. And that you must set aside anything you may have seen or heard before. I assume that is correct.

"If there is anyone who feels they can't follow that now, then let us know now. Remember, there are no right or wrong answers.

"Now have any of you discussed with anyone or overheard any discussion about this case or about the defendant, Tanisha Nobles? Again, if your answer is yes, raise your hand.

"Anyone talk about this to anyone, you know, just, even mentioned it? Okay.

"Now, if you have either discussed this matter or heard someone else talk about it, can you set aside what you heard or what you said and base your decision in this case on the evidence presented in this courtroom? Anyone who can't, raise your hand. Raise your hand, if you cannot. Okay.

"Again, all of those questions which preceded, for the record, there have been no hands raised. And so we will proceed."

The voir dire was then turned over to counsel. The prosecutor broached the media subject with the veniremen again:

"You know it is okay to read the newspaper and watch TV. There is nothing wrong with that. We all do that. We should do that to gather information. And sometimes as a result of that, we form opinions. That is—there's nothing wrong

with forming opinions. We can bring all the opinions we want to the courtroom. But we have to decide the case on the facts. Can you all agree with that?

"So everybody who has read about this case or perhaps heard a news report on the television or the radio, maybe you have or maybe you haven't formed an opinion. But if you have, you can't bring it into the courtroom.

"Is there anyone here as a result of listening to any media event about this case or reading something about this case, that you cannot put aside your opinions, if you formed one?"

In response to this questioning, one of the veniremen, Carlos Nees, raised his hand. The court again asked the panel, "I think the basic question is has anyone formed an opinion on this case that they can't leave behind them and decide this case based upon the facts and evidence presented in this courtroom? Is there anyone else besides Mr. Nees who after thinking about it may have decided that they may have a problem with that? Okay. I'm going to leave the rest of you here." Nees was examined further in chambers and excused for cause. Defense counsel did not request an opportunity to further examine the veniremen themselves on the media issue, and did not object that the court's examination was inadequate. A jury were impanelled the same day, Nobles's pending motion for change of venue was overruled, and trial proceeded.

Though the issue has not been preserved for review as a separate grounds for reversal, we note that there was no constitutional error inherent in the court's not permitting defense counsel to conduct voir dire on the publicity issue. As the Supreme Court observed in *Mu'Min v. Virginia*, *supra*, "our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire." *Id.*, 500 U.S. at 427, 111 S.Ct. at 1906, 114 L.Ed.2d at 507.

We conclude from the record that the veniremen were examined sufficiently for the court to be able to determine whether they could impartially hear the case. The veniremen were repeatedly told that they were to decide Nobles's guilt solely on the evidence presented and the law instructed during the course of the trial, and had three opportunities to inform the court if they could not do so.

Moreover, an entire year had passed between the voir dire examination, which took place on February 7, 1994, and the last pertinent newspaper article that appears in the record before us. A year had also passed since the media leak of a letter Nobles had written to the court, in which she again admitted to drowning her son, but alleged that she was forced to do so by thugs who broke into her house. Ten months passed between the April 22–23, 1993 suppression hearing and the voir dire. It is likely that any prejudicial effect created by media coverage would have subsided considerably during this time. See *State v. Fox* (1994), 69 Ohio St.3d 183, 189, 631 N.E.2d 124, 129–130. We conclude that the court did not abuse its discretion in denying Nobles's motion to change venue.

Nobles additionally argues that the court took insufficient measures to ensure that the jury were not influenced by the media during the course of the trial. The record, however, reveals that the court instructed the jury four times not "to read, view, or listen to any report involving this case in the newspaper, radio, or television." We must presume that the jury followed the trial court's instructions. *State v. Ferguson* (1983), 5 Ohio St.3d 160, 163, 5 OBR 380, 383, 450 N.E.2d 265, 268.

Nobles's first assignment of error is overruled.

## II

"The trial court erred to the prejudice of the appellant by allowing inculpatory statements and conduct made by the appellant into evidence in violation of the *corpus delicti* rule."

In her second assignment of error, Nobles contends that there was insufficient evidence, independent of her confession, to indicate that Erick Nobles was dead, or that he was dead as the result of some criminal agency. Thus, she urges, the *corpus delicti* of homicide was not established, rendering her confession to the murder of her son incompetent. She also argues that her confession was improperly used to establish that she abused her son's corpse, because Erick's body was never recovered, and there was no evidence outside of her confession to indicate that his body had been mistreated.

The *corpus delicti* rule, as employed in the context of extrajudicial confessions, is informed by a desire to protect unfortunate persons who confess to crimes that they not only did not commit themselves, but which were never committed by anyone. Before the rule was formed, it sometimes happened that a person would confess to killing another, be convicted of that killing and put to death, only to have the supposed murder victim turn up later, alive and healthy. "Therefore, the rule that there must be some evidence tending to prove the fact that death had actually [occurred] ensued; which was later followed by an

additional requirement of some evidence that that death was brought about by some criminal agency." *State v. Maranda* (1916), 94 Ohio St. 364, 370, 114 N.E. 1038, 1040.

The rule survives in this form today, and is applied to all crimes, not homicide alone. Before an extrajudicial confession of a crime is competent to be admitted at the confessor's trial, the state must first introduce evidence *independent of the confession* tending to establish "(1) the act, and (2) the criminal agency of that act." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph 1a of the syllabus. The evidence adduced must meet some essential element of the crime charged, though it need not meet all of them. "Ohio does not require evidence upon all elements of the crime but only 'some material element.'" *State v. Van Hook* (1988), 39 Ohio St.3d 256, 262, 530 N.E.2d 883, 888–889, quoting *State v. Maranda, supra,* 94 Ohio St. at 372, 114 N.E. at 1040. The evidence presented need not be so strong that it is capable of persuading a factfinder on some element of the crime beyond a reasonable doubt, but "there must be *some* proof, not necessarily direct and positive, usually but circumstantial, tending to prove the fact that a crime was committed." *Id.* at 371, 114 N.E. at 1040. See, also, *State v. Burge* (1987), 42 Ohio App.3d 35, 36, 535 N.E.2d 1389, 1390–1391; *State v. King* (1983), 10 Ohio App.3d 161, 166, 10 OBR 214, 219–220, 460 N.E.2d 1383, 1388–1389; *State v. Edwards, supra,* at paragraph 1c of the syllabus; *State v. Black* (1978), 54 Ohio St.2d 304, 8 O.O.3d 296, 376 N.E.2d 948, syllabus.

Nobles was charged with murder, a violation of R.C. 2903.02(A), and with gross abuse of a corpse, a violation of R.C. 2927.01(B). Before Nobles's confession could be admitted as proof that she committed either of these crimes, independent evidence must have been adduced tending to show both that Erick Nobles was murdered, and that his corpse was abused. See *State v. Van Hook, supra,* 39 Ohio St.3d at 261, 530 N.E.2d at 888.

Murder is proscribed in R.C. 2903.02(A): "No person shall purposely cause the death of another." To meet the minimum requirements of the *corpus delicti* of murder, the state had to indicate "(1) the fact of death, and (2) the existence of the criminal agency of another as the cause of death." *State v. Manago* (1974), 38 Ohio St.2d 223, 67 O.O.2d 291, 313 N.E.2d 10, paragraph one of the syllabus. Because it was not necessary for the state to present evidence supporting all of the elements of murder, it was not necessary to show the criminal agent's purpose to kill, but only that a criminally caused death did occur.

Nobles contends that there is no evidence, outside of her confession, that tends to show that her son is dead. Neither Erick's body nor any evidence betraying a violent struggle was ever discovered in this case. Nobles argues that

the fact that he is missing is insufficient, standing alone, to indicate death. We must agree with this statement. The *corpus delicti* rule was formed to prevent the conviction and punishment of persons who confessed to murdering someone who was never in fact murdered. It is always the case that a purported murder victim is, at the time of the confession, trial, conviction, and execution, missing. It is only when the supposed victim later appears that the state realizes what a ghastly mistake it has made.

However, in this case, the state led independent evidence of other facts, which, when viewed as a whole, tend to show that Erick Nobles is dead, and that his death was caused by some criminal agency. The record is replete with Nobles's various false accounts of how her son came to be missing. Her conduct argues strongly that she was at least colluding in some scheme to fake her son's sudden departure.

During the week following Erick's murder, Nobles received numerous phone calls and questions from her family and her neighbors asking where Erick was. She told nonfamily members that Erick was staying with her grandmother. It was in fact her grandmother's habit to keep Erick at her house frequently, but she did not have him, and had not seen him since Christmas day. Nobles's grandmother had arranged to pick Erick up New Year's weekend, but was herself told that the boy was with a babysitter at that time. She phoned Nobles again during the following week, and announced that she would be around the weekend of January 7 to get him. Nobles agreed.

In the afternoon of January 7, 1993, Nobles folded Erick's winter coat over her arm and boarded a bus for the Salem Mall. A friend of hers boarded with her, and in response to her inquiry, Nobles told her that Erick was at her grandmother's. This friend testified that Nobles appeared to be worried about something, because she avoided making eye contact with her when speaking, and instead often looked up at the ceiling. Nobles knew the busdriver on this route as well, and chatted briefly with him. He testified that when he asked her where the "little man" was, she explained that he was at a babysitter's, and that she was going to pick him up before going on to the mall. She got off the bus downtown, and transferred to another mall-bound route.

When she arrived at the Salem Mall, she approached an employee of a McDonald's adjacent to a corridor leading to the public restrooms, and asked her to call for a security guard. The assistant manager appeared, and she told him that her baby was missing from the men's restroom. He asked if she would like him to look for her son there, and she declined. He looked in spite of her, but did not find the boy.

Douglas Bizzell, a mall security guard, appeared shortly thereafter. She informed him that her son had disappeared from the women's restroom. She said that she had taken him into the restroom stall with her, that he had used the facilities first, and then while she was occupied, had crept out below the door of the stall. She assumed that he was out washing his hands, she said, but when she left the stall, he was gone. She described to Bizzell what Erick was wearing, and gave Bizzell a wallet-sized photo of him. When Bizzell suggested that they look for Erick in Kay–Bee Toys, she demurred, saying that she had already been in there. Bizzell searched Kay–Bee Toys himself, and made inquiry of store employees, who denied that they had seen either Erick or his mother in the shop that afternoon. This same scenario was played out in many other shops in the mall. Nobles also declined to enter large department stores to assist in the search, indicating to Bizzell that she had already looked for Erick everywhere before Bizzell was sent for. Bizzell testified that she volunteered no information to him, and appeared "calm for a person whose little child has been missing." Bizzell took Nobles back to an information booth to sit while he and a couple of other mall security guards continued looking for Erick.

City of Trotwood police officers arrived, found Nobles at the information booth, and asked her what had happened. Officer Derringer took a statement from her regarding her son's disappearance, and got a detailed physical description of him. He testified that Nobles did not seem very concerned, and "really wouldn't make eye contact with" him. Other Trotwood police officers continued in searching the mall for Erick late into the night. The following day, Trotwood police contacted Nobles to arrange an interview with her for more details of the circumstances of her son's disappearance. Nobles never inquired about the status of the investigation, whether her son had been found, or whether the police had any promising leads. During the ensuing several days, Nobles phoned the police department once, to say that a friend of hers thought he had seen Erick at the Good Samaritan Hospital. Police follow up on that lead yielded nothing. Testimony revealed that Nobles never otherwise indicated any interest in the police investigation, or any curiosity about how the police were going about finding her son.

On January 12, 1993, Officer Culbertson of the Trotwood Police Department drove Nobles to the Professional Law Enforcement Center. While there, Nobles changed her story. She said she had not really lost Erick at the Salem Mall, but had given him away to a black couple at a local Kroger grocery store, one Karen Wilson and her unnamed husband, whose own child had recently died. The couple both had good jobs and lived in the Five Oaks area, she said, though they spoke of possibly moving away very soon. She claimed that she had the woman's phone number written down on a piece of paper at her home. She said she had decided to give Erick away because she "was under a lot of stress," was feeling

"like [she] had no kind of freedom, he was always getting into stuff and [she] was always yelling at him" and "didn't want to get to the point that [she] would hit him or anything like that." In response to the statement, Trotwood police phoned the Montgomery County Coroner's Office and were informed that no child of a Karen Wilson had died in Montgomery County in the few previous months. Nobles agreed to return to her apartment with the police to locate Ms. Wilson's phone number, but the number could not be found. In a series of statements that followed, Nobles asserted first that her son had accidentally drowned in the bathtub while she left him unattended, and admitted, ultimately, that she had drowned him, because he got on her nerves and she felt she had no life of her own.

■■■ Nobles argues, referring to *State v. Dudley* (1969), 19 Ohio App.2d 14, 48 O.O.2d 19, 249 N.E.2d 536, that the trial court was not entitled to rely on any of the statements or conduct recounted above in establishing the *corpus delicti*, because they are, like Nobles's confession itself, "circumstantially consistent with a theory of guilt." *Id.* at 26, 48 O.O.2d at 27, 249 N.E.2d at 544. We disagree. *State v. Dudley* essentially concerned the quantum of proof necessary to support a conviction. The appellant argued that his conviction for assault with intent to kill was not supported by legally sufficient evidence because the state could produce no "bleeding, damaged, and bandaged complaining witness" against him. *Id.* at 25, 48 O.O.2d at 26, 249 N.E.2d at 543. The victim of the assault had disappeared, leaving nothing but a red cap and spots of blood behind him. This bleeding witness, Dudley posited, was the *corpus delicti* without whom his guilt could not be proven beyond a reasonable doubt. Though the appellant had made admissions to the police that placed him at the crime scene at the relevant time, the Court of Appeals for Franklin County specifically held that the case did not involve the admissibility of any extrajudicial confession. Rather, the question before the court was whether sufficient evidence had been presented to prove beyond a reasonable doubt that the crime charged had been committed—that the victim of the assault had been beaten with an intent to kill. This is what the *Dudley* court meant by *corpus delicti*. To seal Dudley's conviction, once the fact of the crime had been established beyond a reasonable doubt, it was only necessary that he be identified, beyond a reasonable doubt, as the one who made the assault. Thus, *State v. Dudley* dealt with a different use of the *corpus delicti* doctrine than we have to deal with here, and with a higher standard of proof than we require to admit an extrajudicial confession.

Nobles's frankly understandable confusion arises from the fact that the *Dudley* opinion proceeds to treat cases that do deal with the admissibility of extrajudicial confessions, including *State v. Maranda, supra*. By synthesis of a case from California, *People v. Scott* (1959), 176 Cal.App.2d 458, 1 Cal.Rptr. 600, which did

not involve the admissibility of an extrajudicial confession, with *State v. Maranda*, which did, the *Dudley* court concluded, "The principle announced in *Scott* and *Maranda* is that there need only be *some* evidence introduced 'tending to prove some material element of the crime charged before any and all evidence of the acts and statements of the defendant, circumstantially consistent with a theory of guilt, may be admissible in evidence." (Emphasis *sic*.) *State v. Dudley, supra*, 19 Ohio App.2d at 24–25, 48 O.O.2d at 26, 249 N.E.2d at 543. One implication of this language is that no acts or statements of the defendant can be used as independent evidence that a crime has been committed. To the extent that this language purports to describe the sort of independent evidence that can be used to render an extrajudicial confession admissible, it must be regarded as dicta, as that issue was not before the court. Even so, we observe that there is nothing in *Maranda* or its (legitimate) progeny to suggest that no guilty conduct of the defendant can be recognized as independent proof that the crime she is accused of was in fact committed.

None of the statements or conduct we have recounted and relied on above amount to confessions or admissions that Erick is dead, or that Nobles killed him. They only condemn Nobles by their variety and their falsity. There is no reason to suppose that the *corpus delicti* rule was ever intended to shield those who arouse suspicion by noisily and unskillfully trying to cover up a criminal act. To interpret the rule in such a way would be merely to place a premium on the disposal of the evidence, for anyone who succeeded in completely disposing of the body and concealing any murder instrument could, however she behaved afterward, and however ardently she confessed, escape prosecution, if we adopt the rule of law Nobles urges on us. This would make cases of infanticide, in particular, virtually impossible to prosecute. As the Supreme Court has noted, " 'The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward.' " *State v. Nicely* (1988), 39 Ohio St.3d 147, 156, 529 N.E.2d 1236, 1244, quoting *People v. Manson* (1977), 71 Cal.App.3d 1, 42, 139 Cal.Rptr. 275, 298.

Therefore, we hold that Nobles's spurious reports of abduction, abandonment, and her other attempts at concealment may be considered independent evidence tending to show that Erick has been murdered. See *Nicely* at 155, 529 N.E.2d at 1243. While some other construction of Erick's disappearance and Nobles's conduct prior to her confession is conceivable (for instance, Nobles could have sold her child to the Mob), it is not necessary that the evidence rule out all theories inconsistent with murder. Nor need it prove murder beyond a reasonable doubt, but need only be enough to tend to show that murder was done. See *State v. Van Hook, supra*, 39 Ohio St.3d at 262, 530 N.E.2d at 889. With respect

to the charge of homicide, we conclude that the court did not err in admitting Nobles's confession.

Likewise, the *corpus delicti* of gross abuse of a corpse required the state to show by independent evidence that Erick's corpse had been treated outrageously by some criminal agent. Abuse of a corpse is defined in R.C. 2927.01(B): "No person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." The factual basis of this charge rested in Nobles's admission that after she drowned her son, she put his body into a garbage bag and kept it in a closet for several days before disposing of it in a dumpster. From the dumpster, the garbage was picked up and ultimately reduced to ash in the county incinerator. Of this precise chain of events there is no evidence independent of her confession. However, gross abuse of a corpse can apparently be found in any attempt to conceal a body. See *State v. Benge* (Dec. 5, 1994), Butler App. No. CA93–06–116, unreported, 1994 WL 673126; *State v. Eades* (Feb. 25, 1994), Montgomery App. No. 13807, unreported, 1994 WL 53834; *State v. Riggs* (Oct. 4, 1993), Meigs App. Nos. 503 and 506, unreported, 1993 WL 405491; *State v. Wolf* (Dec. 11, 1992), Lake App. No. 91–L–096, unreported, 1992 WL 366985; *State v. Frazier* (Dec. 18, 1991), Fairfield App. No. 13–CA–91, unreported, 1991 WL 299524; and *State v. Hoeflich* (June 22, 1989), Morrow App. No. CA–689, unreported, 1989 WL 75673. The same evidence that tends to show that Nobles murdered her son tends also to show that she has abused his corpse by concealing it.

We overrule Nobles's second assignment of error.

## III

"The trial court abused its discretion by granting the prosecutor's request for the jury to view the Montgomery County incinerator."

Nobles urges that the court acted unconscionably in permitting the jury to view the Montgomery County incinerator. She analogizes the view to that of a grave site, and argues strenuously that the jury was so inflamed by the entire trash dumping, drying, dragging, and charring tableau that they were incapable of receiving evidence relating to the alleged disposition of Erick's body with the impartiality that was her constitutional right. She further contends that a jury view of any site is improper unless an element of the crime is alleged to have taken place there. We disagree.

"When it is proper," a court may permit a jury to view "the place at which a material fact occurred." R.C. 2945.16. The Court of Appeals for Cuyahoga County has noted, "The case on trial may be one in which any number of material facts occurred in a variety of places. Clearly, it would not be violative

of the statute, under such circumstances, that all such places be viewed by the jury. The statute does not contain the language, 'where the crime occurred,' nor is it limited to that construction." *State v. Pigott* (1964), 1 Ohio App.2d 22, 25–26, 30 O.O.2d 56, 58, 197 N.E.2d 911, 914. In *Pigott* it was held that in a trial for first degree murder, the trial court did not err in permitting a jury view of places at which other, similar assaults, to which the defendant had confessed, took place. The court cautioned that although evidence of the similar acts was admissible, it should have been accompanied by "a definite admonition 'that such evidence is not to be considered as substantive evidence or proof of the crime charged.'" *Id.* at 30, 30 O.O.2d at 61, 197 N.E.2d at 916. In spite of the fact that such a cautionary instruction was not given, because a jury view of the places where the other assaults were performed would assist the jury in understanding later testimony relating to those other assaults, the trial court was held to have acted within its discretion in permitting the view. Likewise, in *State v. Birt* (Nov. 8, 1982), Montgomery App. No. 7205, unreported, 1982 WL 3847, this court held that a jury view of a warehouse in which allegedly stolen boxes of cheese were stored was not an abuse of discretion, because it "was an area mentioned in the testimony as to where the boxes were placed after they were in the possession of the police."

■ In this case, viewing the incinerator assisted the jury in understanding trial testimony relating the fate of the contents of the dumpster where Nobles confessed she had disposed of her son's body. It also explained why Erick's body had never been recovered. This issue was first broached early in the trial, as defense counsel cross-examined Barbara Brigner, the Registrar of Vital Statistics for Montgomery County, about whether her office had any record of Erick Nobles's death. She answered that to her knowledge there was none. On redirect, she testified, "The Coroner's Office could not do a death certificate because there was no body recovered."

The jury were instructed before the view: "What you observe outside the courtroom is not evidence. * * * The only purpose of your visit is to help you to understand the evidence as it is presented in the courtroom." Moreover, the court personally viewed the premises before the jury were to be taken there, and found that the sight was not unduly prejudicial and that the jury would not fully understand the testimony without it. We see no abuse of discretion in the court's allowance of the jury view.

Nobles's third assignment of error is overruled.

## IV

"The trial court erred by refusing to make a complete record of all of the proceedings below."

█ Nobles here asserts that a number of crucial evidentiary rulings escaped appellate review through the court's failure to record all of the sidebar conferences held during the trial. Crim.R. 22 requires that all proceedings shall be recorded in serious offense cases. At at least one point in the trial, Nobles's defense counsel requested that "a record of each sidebar be made," remarking that "that has not been the case up to this point in time." The court denied the request: "Sometimes there is a question that needs to be discussed where the court reporter is not required. I cannot think of one issue that was discussed at sidebar that was asked to be put on the record that was not put on either at the time or before or since." The record discloses that some thirteen or so sidebar conferences went entirely unrecorded. However, the result of two of these unrecorded sidebars was a ruling favorable to Nobles, and another evidently concerned sending the jurors home early to avoid a winter storm.

█ In any event, we note that Nobles has not attempted to supply the gaps in the record through App.R. 9(C) or 9(E),[1] either "to reconstruct what was said or to establish its importance." *State v. Brewer* (1990), 48 Ohio St.3d 50, 61, 549 N.E.2d 491, 502. The *Brewer* court observed that in some jurisdictions, courts have presumed prejudice to the defendant when the proceedings have not been completely recorded and the defendant is represented by different counsel on appeal. *Id.* at 60, 549 N.E.2d at 501. However, the *Brewer* court did not adopt such a rule for Ohio. "In the absence of an attempt to reconstruct the remarks and demonstrate prejudice, the error may be considered waived." *Id.* at 61, 549 N.E.2d at 502; *State v. Tyler* (1990), 50 Ohio St.3d 24, 41, 553 N.E.2d 576, 595–596; *State v. Jells* (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464, 473–474.

We have thoroughly examined the context of the unrecorded sidebar conferences, and it does not suggest to us that reversible error is hidden in any off the record discussion. Consequently, we must presume that the trial court was correct in saying that nothing of importance went unrecorded during the trial. Nobles's fourth assignment of error is overruled.

## V

"The misconduct of the prosecution denied appellant's right to a fair trial."

---

1. App.R. 9(C) provides, in pertinent part, "If no report of the evidence or proceedings at a hearing or trial was made, or if a transcript is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection."

App.R. 9(E) states, "If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the trial court, either before or after the record is transmitted to the court of appeals, or the court of appeals, on proper suggestion or of its own initiative, may direct that omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted."

Nobles has brought a number of allegations of prosecutorial misconduct, most of which assert that the state incited the passions of the jury against Nobles by rousing sympathy for her dead son and by suggesting that defense counsel were attempting to hoodwink them. In order for prosecutorial misconduct to warrant reversal, it must appear from the record that the state's conduct was improper, and that the improper conduct robbed the appellant of a fair trial—a trial whose result is reliable. See, generally, *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203. Prosecutors are granted wide latitude in closing argument to urge that the evidence presented and the only reasonable inferences to be drawn from that evidence point to the guilt of the accused. However, it is improper for the state to rouse the jury to convict merely by exciting their indignation against the defendant, against defense counsel, or against the crime itself. "The relevant inquiry at a criminal trial is not whether the jury is opposed to the acts allegedly committed by the defendant, or whether they are horrified by the results of those acts, but whether the defendant has been shown, beyond a reasonable doubt, to be guilty of doing those acts." *State v. Hart* (1994), 94 Ohio App.3d 665, 673, 641 N.E.2d 755, 760. Likewise, it is improper for the state to suggest that defense counsel are themselves convinced of their client's guilt, but are using deception and trickery to persuade the jury not to convict. *Id.* at 674, 641 N.E.2d at 760–761; *State v. Keenan, supra,* 66 Ohio St.3d at 405–406, 613 N.E.2d at 206–207.

We have thoroughly examined each of the eight or so alleged instances of misconduct, and find that two of them warrant discussion. In closing argument, the state narrated the circumstances of Erick's death and the fate of his body. After describing Erick's drowning in some detail, the state pointed out that Nobles, though she looked small sitting in the courtroom, significantly outweighed her small son. "Erick didn't have a chance. Erick didn't have a chance. You give her the same mercy she gave him on December 26, 1992." The state continued, "She takes that poor child's body. She lifts him out of that tub and she puts him in a garbage bag to dispose of and conceal the evidence. And you know the rest of the story. How his body makes it out to the ash pit. He's never been given a proper funeral or burial. His ashes are all over Webster Street someplace in an ash pile. You give her the same mercy." This is precisely the sort of emotional appeal condemned in *State v. Keenan* and *State v. Hart, supra.* It urges conviction based on the enormity of the crimes and not because the evidence before the jury demands the conclusion that Nobles is guilty of committing those crimes.

In another line of argument, the state characterized Nobles as a liar who tried to cheat her way out of suffering the consequences of her criminal conduct. This invective was well supported by the evidence before the jury. However,

dishonesty was imputed to her defense counsel as well. "I submit to you now the defense is trying to deceive you into selecting a story that's not the truth. The defense has asked the Court to issue instructions of law regarding lesser included offenses, manslaughter, which the Court will read you the law about. The defense wants to mitigate its damages here. The defense has asked for an instruction of manslaughter with an underlying offense of child endangering. If you don't believe that one, how about manslaughter with an underlying offense of reckless assault? And if you don't buy that, let's go back to our argument, which is, the state didn't prove its case beyond a reasonable doubt because you don't know what to believe. It's like the Monty Hall routine. Which door do you want? Pick one. Pick door number one, door number two, door number three. * * * [T]he people of the State of Ohio didn't ask for a lesser included. That is not what we want. * * * This isn't let's make a deal."

To target defense counsel for such censure is highly improper. It chills an accused's right to instructions on lesser included offenses where the evidence reasonably warrants such instructions. It also suggests that defense counsel knew that Nobles was guilty of murder, and that they knew her acquittal of that charge depended on their success in hoodwinking the jury. "The personal opinion of defense counsel of their client's guilt or innocence is no more relevant than the opinion of the prosecutor. Yet, if the jury believes that even the defendant's own advocates think him guilty, that belief will naturally carry great weight in their deliberations. The jury is also likely to resent defense counsel's perceived insincerity." *State v. Keenan, supra,* 66 Ohio St.3d at 406, 613 N.E.2d at 207.

We observe that defense counsel lodged no objection to either of these two instances of misconduct, nor to any similar, though less egregious, argument treating the same subject matter. There is no reason to suppose that defense counsel's right to object was chilled during closing argument, as was the case in *Keenan.* As a result, the errors are not properly preserved for appellate review. *Id.* at 410, 613 N.E.2d at 209–210.

However, even if they had been, it does not appear that they deprived Nobles of a fair trial. When examining a record for prejudice, a reviewing court considers "the effect the misconduct had on the jury in the context of the entire trial." *Id.* In light of Nobles's confession and the circumstances of record surrounding it, as well as the fact that no evidence was presented at trial indicating that Erick met with any other fate than that Nobles related, we cannot say that the state's misconduct shakes our confidence in Nobles's conviction. Thus, while we caution the Montgomery County Prosecutor's Office against

jeopardizing criminal convictions with improper argument, we cannot conclude from this record that the prosecutor's conduct warrants reversal.

Nobles' fifth assignment of error is overruled.

## VI

"Appellant was denied her Sixth Amendment right to effective assistance of counsel."

Nobles alleges that her trial counsel defended her ineffectively when they conducted no cross-examination of sixteen of the state's witnesses, when they did not call a rebuttal witness who would have testified that Nobles seemed very upset to have lost her son at the mall, when they did not impeach Detective Culbertson's testimony at the suppression hearing that he did not believe Nobles to have been under the influence of any medication on the day she confessed, when they failed to insist upon a record of each sidebar, when they failed to move for a mistrial or a new jury after the jury view of the incinerator, when they argued to the jury that Nobles was guilty of negligently allowing her child to drown, and when they did not call a witness who could testify at the suppression hearing that Nobles was under the influence of a prescription narcotic when she confessed.

In order to prevail on a claim of ineffective assistance of counsel, Nobles must demonstrate that her trial counsel committed errors so egregious that they were "not functioning as the 'counsel' that the Sixth Amendment guarantees." *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70, 81. The errors complained of must amount to a " 'substantial violation of * * * defense counsel's essential duties to [their] client.' " *State v. Bradley* (1989), 42 Ohio St.3d 136, 141, 538 N.E.2d 373, 379, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 2 O.O.3d 495, 497–498, 358 N.E.2d 623, 627. When reviewing counsel's conduct of a defense, "[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook, supra,* 65 Ohio St.3d at 524–525, 605 N.E.2d at 81. Even if defense counsel did not violate some essential duty to Nobles, she must yet show that, were it not for her counsel's unprofessional errors, there is a reasonable probability that she would not have been convicted. *State v. Bradley, supra,* paragraph two of the syllabus.

With this in mind, we will address each of the seven instances of ineffectiveness in the order in which Nobles alleges them in her brief. Of the nineteen witnesses the state called, defense counsel cross-examined three. One of these three witnesses was the Registrar of Vital Statistics for Montgomery

County, who had apparently been called to testify to the fact that Erick was born to Tanisha Nobles in Montgomery County. The other two witnesses were friends of Nobles, one of whom testified to her demeanor on the day she set out for the Salem Mall, and the other of whom testified to her demeanor and behavior in the weeks following her son's death. None of these three witnesses testified to Nobles's confession, or to the events at the Salem Mall. Each of the other sixteen witnesses testified either on these subjects, or about the processing of garbage in Montgomery County. Defense counsel objected to the admission of testimony concerning the fate of garbage in Montgomery County and the events at the Salem Mall on the grounds that it was irrelevant. If Nobles abused her son's corpse, they argued, she completed the offense when she put his body into the trash dumpster. Further testimony about what happened to that trash afterward can only have served to inflame the passions of the jury. They put the same objection to the testimony about the false report of abduction at the Salem Mall. Testimony on that point was unnecessary, they argued, because Nobles had pled no contest to the inducing panic charge. Finally, they argued strenuously that Nobles's confession to her son's murder was incompetent because the state could not establish through independent evidence that Erick had been killed at all.

Defense counsel noted on the record that "the absence of cross-examination on virtually nearly every witness in this case was a trial strategy that the defense employed in reliance on a case called *State v. Miller* [ (1988), 56 Ohio App.3d 130, 565 N.E.2d 840]. * * * What that case says is that if you object to testimony and then do any cross on a witness, your objection is waived. In view of the underlying *corpus delicti* issue in this particular case, we felt it incumbent upon us not to sully the record with any cross-examination of the witnesses on that point." *State v. Miller, supra*, does stand for the proposition that an appellant " 'can object to the testimony and stand on that objection or he can attempt to present evidence to rebut the alleged [objectionable] testimony. The choice of this second alternative, however, waives any error of an evidentiary nature in admitting such * * * testimony.' " *State v. Miller, supra*, 56 Ohio App.3d at 132, 565 N.E.2d at 844, quoting *State v. Wales* (Jan. 5, 1977), Hamilton App. No. C–75674, unreported. This rule of law has been followed in a number of jurisdictions besides Hamilton County. The lone dissenting voice thus far seems to belong to the Court of Appeals for Franklin County, which noted, "If the objection were waived, a party would be forced to make a 'Catch–22' choice between defending against the evidence in the trial court or preserving the error for appeal and hoping for a reversal. This concept is contrary to common sense, fundamental fairness, and to the requirements set forth by Evid.R. 103(A). * * * [S]uch a waiver rule would raise serious constitutional due process and confrontation issues." *State v. Faris* (Mar. 24, 1994), Franklin App. No.

93APA08–1211, unreported, 1994 WL 97095. While we would be inclined to agree with the point of view expressed in *Faris* on this issue, this court has yet to formally accept or reject the waiver rule expressed in *Miller*. That being the case, it would have been foolish of defense counsel to hazard waiving their objection to the admission of Nobles's arguably incompetent confession to murder, or the arguably irrelevant and inflammatory evidence concerning the incinerator and the Salem Mall. Defense counsel made a valid tactical decision not to cross-examine the state's witnesses on these issues. Moreover, Nobles has not shown us how her trial counsel could have cross-examined the state's witnesses on matters unrelated to her confession, her behavior at the mall, or the incineration of garbage containing her son's body in such a way that she would have escaped conviction of either of the charges she faced. We must conclude that her counsel neither failed in an essential duty to her, nor prejudiced her rights, by conducting no cross-examination of most of the state's witnesses.

Nobles urges that her counsel failed her in not calling a witness to rebut testimony from the state's witnesses that she did not appear to be upset about the disappearance of her son at the mall. This rebuttal witness had been quoted in the *Dayton Daily News* as saying that Nobles appeared to be very upset indeed, and that he did his best to comfort her. We note that under the waiver rule announced in *State v. Miller, supra,* Nobles would have waived her objection to the admission of testimony about her demeanor at the mall if she attempted "to present evidence to rebut the alleged [objectionable] testimony." *Id.,* 56 Ohio App.3d at 132, 565 N.E.2d at 844. Thus, defense counsel were justified in not calling a witness to rebut what they urged was irrelevant evidence for the same reason they were justified in not conducting cross-examination on that allegedly irrelevant evidence. In addition, of course, no one has contended that the abduction story is actually true, and it cannot have made any difference to the outcome of the trial that one witness might have found Nobles's demeanor as she made the false report thoroughly convincing.

Nobles contends that her defense counsel was ineffective in not introducing evidence relating to her ingestion of Xanax the day she confessed. She argues that Detective Culbertson, despite his testimony to the contrary, was aware that she was under the debilitating influence of this prescription narcotic through at least part of the day. Detective Culbertson ought to have been impeached with his prior statements to reporters from the *Dayton Daily News* that he knew she had taken this drug, Nobles urges, and either a medical expert or Nobles herself ought to have testified at the suppression hearing about the drug's debilitating effects. Nobles posits that such evidence, if heard, would almost certainly have resulted in the suppression of her confession.

■■ While we disagree that the mere fact Nobles may have been impaired will make her confession involuntary as a matter of law—see Assignment of Error VIII—it may be the case that significant narcotic impairment would have made her confession inadmissible because unreliable. However, the record before us does not speak to the effects of Xanax or to how long they last. If it is the case that Xanax could have caused Nobles to make a false confession, though it was made some twelve hours after she ingested the drug, then counsel will have to raise the matter in a petition for postconviction relief. *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 228, 4 OBR 580, 581–582, 448 N.E.2d 452, 454. The allegation Nobles raises here is based on facts that are not in the record, and so we can award her no remedy on direct appeal. *State v. Lane* (Feb. 3, 1995), Greene App. No. 94–CA–8, unreported, 1995 WL 39300.

■■ Nobles next alleges that her counsel failed her in not insisting upon a record of all of the sidebar conferences that were held throughout the course of the trial. The record reveals that defense counsel attempted from the very first sidebar to make a complete record of them, and when the court denied the request, they entered an objection on the record. See our discussion under Assignment of Error IV, *supra*. Trial counsel could have done no more, and certainly violated no essential duty they owed to Nobles.

■■ Based on our disposition of Nobles's third assignment of error, we conclude that defense counsel did not render her ineffective assistance in failing to move for a mistrial, or for additional voir dire or discharge of the jury following the jury view of the county incinerator. We find no prejudicial error in the court's allowing the view, and counsel cannot be ineffective for failing to make a motion the refusal of which would not amount to an abuse of discretion.

■■ Finally, Nobles argues that her counsel were ineffective in their voir dire and closing argument to the jury, once actually telling the prospective panel, "You folks are the public. You folks are the State of Ohio." While such a remark was probably unwise, we cannot conclude from the record that the jury were under the impression that they were to be anything but impartial in weighing the evidence. In fact, three sentences later, defense counsel reminded the prospective jury that the purpose of voir dire was to determine whether all of them were able to "fairly and impartially weigh the evidence and reach a verdict."

■■■ Nobles asserts that her counsel violated an essential duty to her by conceding in closing argument that she was a liar, that Erick had drowned in the bathtub, and that she had improperly disposed of his body. We disagree. Counsel brought a motion to suppress Nobles's confession, and lost it. The evidence presented at trial therefore contained statements by Nobles that she had held her son's head under water until he stopped struggling, and that she

then put his body into a garbage bag and threw him into a dumpster. In addition to this were her other, widely divergent accounts of how Erick came to be missing. Defense counsel, in light of this evidence, were forced to make some concessions. When it is incontrovertible that Nobles told police variously that she lost her son at the mall, gave him away at a grocery store, and let him accidentally drown, before confessing that she killed him, counsel could neither pretend that she made no such statements, nor that they were all true. By conceding that she had tried to escape responsibility for Erick's death by lying to the police, counsel made the best of a very difficult situation. They argued strenuously that Nobles finally and fully accepted responsibility for her son's death when she admitted that she had allowed him to drown while she left him unsupervised in the bathtub—that she was guilty of involuntary manslaughter with the underlying offense of child endangerment. They pointed out that Nobles never said that she deliberately held her son's head under water in the taped interview containing her final confession, but that those were the words of Doyle Burke, the police officer who took her statement. In this way they sought to undermine the reliability of Detective Burke's testimony that Nobles confessed to holding Erick's head under the bathwater until he stopped kicking, and attempted to persuade the jury that they should convict merely on the lesser charge of involuntary manslaughter. This was a sound trial tactic, under the circumstances, and "we must accord deference to defense counsel's strategic choices." *State v. Bell* (1990), 70 Ohio App.3d 765, 769, 592 N.E.2d 848, 850. We cannot say that Nobles's defense counsel breached an essential duty to their client by pursuing one trial strategy rather than another, though in hindsight some strategy not chosen might have been more successful. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192.

Nobles's sixth assignment of error is overruled.

## VII

"The trial court committed prejudicial error in admitting irrelevant evidence, and excluding relevant evidence, thereby violating appellant's right to a fair trial."

In her seventh assignment of error, Nobles asserts that she was unfairly prejudiced by the admission of extensive testimony about the events at the Salem Mall and the processing of garbage in Montgomery County, and by the admission of trial exhibits related to this testimony. She also objects to the court's exclusion of a videotape, a portion of which shows Erick and his family at Christmas immediately before the murder.

"A trial court enjoys broad discretion in admitting evidence. [A reviewing] court will not reject an exercise of this discretion unless it clearly has

been abused and the criminal defendant thereby has suffered material prejudice." *State v. Long* (1978), 53 Ohio St.2d 91, 98, 7 O.O.3d 178, 182, 372 N.E.2d 804, 808. The fact that Nobles attempted to fake her son's abduction from the Salem Mall tends to show that she murdered him. The Salem Mall testimony set up a chronology of events relevant to the police investigation in this case and provided the court with the independent evidence of murder it needed to overrule Nobles's pending motion in limine on the *corpus delicti* issue. Thus, it was helpful to the jury in understanding the evidence later adduced and was itself relevant to the murder charge.

Likewise, evidence about the processing of garbage in Montgomery County, in light of Nobles's confession that she disposed of her son's body in a garbage dumpster, finished the chronology of events in this case for the jury, and allowed the state to explain why Erick's body had never been recovered. See our discussion of Nobles's third assignment of error.

We conclude that the court did not abuse its discretion in admitting evidence on either of these subjects.

▮ During her case in chief, Nobles attempted to introduce a videotape taken of Erick and other members of the family opening presents at Christmas. Defense counsel urged that the tape, in particular a brief portion showing Nobles and her son together, would allow the jury to see Nobles's state of mind on the eve of the alleged murder. The court excluded this evidence, ruling that it was irrelevant to any of the elements of the crimes with which she had been charged, and was not evidence demonstrating her character for truthfulness.

Evid.R. 404(A)(1) permits a criminal defendant to offer evidence of a pertinent trait of her own character, and is not limited to offering evidence only of her veracity. The state introduced evidence tending to show that Nobles was frustrated in the role of motherhood, and so resentful of her son as a result that she deliberately drowned him as he was taking a bath the very day after the videotape was taken. The videotape was intended to show that Nobles was a loving, happy mother who could not have been the callous murderess the state represented her to be.

In our view, the videotape should have been admitted. However, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Evid.R. 103(A). In light of the body of evidence presented by the state in this case, we conclude that the court's error in refusing the videotape was harmless beyond a reasonable doubt.

Nobles's seventh assignment of error is overruled.

## VIII

"The trial court erred by denying appellant's motion to suppress."

██ Nobles contends that her confession ought to have been suppressed because it was not voluntarily given. She alleges that when she made her confession on the evening of January 12, she had been in police custody for twelve hours, and had been interviewed frequently and by a number of different persons during that time. Moreover, she had used the restroom only once that day, and had not eaten. She had taken Xanax, a prescription narcotic, at 7:00 or 7:30 that morning. Under the totality of the circumstances test outlined in *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, she urges, her confession was the product of coercive police activity. See *State v. Loza* (1994), 71 Ohio St.3d 61, 641 N.E.2d 1082.

The trial court found that although Nobles had spent twelve hours with police officers, a relatively short period of that time was actually spent in police interviews. See *State v. Brewer, supra,* 48 Ohio St.3d at 58, 549 N.E.2d at 499–500. Much of the day, the court found, was consumed in following up on Nobles's various accounts of what had happened to her son. In the early afternoon, when Nobles admitted that her son had drowned at their home in Dayton, an entirely new police department had to be involved in the case, which caused additional delay and the necessity of her being questioned by a fresh new batch of homicide detectives.

The trial court also found that Nobles was not physically deprived by the police during this time; they offered her drinks and restroom breaks throughout the day, which she refused. While the trial court did not comment on Nobles's suggestion that she was under the influence of Xanax at the time she confessed to murdering her son, the court noted that police consistently testified that in all their dealings with her that day, she was calm and coherent.

Nobles was not actually placed under arrest until 7:10 in the evening, after she confessed to drowning Erick. Though she was not in custody for most of the day, every time she was asked to make a statement to police officers to assist them in locating Erick, she was advised of her right to remain silent, and of her right to consult with an attorney. She indicated each time that she understood those rights, and that she waived them.

██ We find ample support in the record for the trial court's findings of fact, and, having reviewed the record for the circumstances surrounding Nobles's confession, agree with the court's conclusion that it was not the product of any physical abuse, harsh conditions, or any unreasonably lengthy or grueling interrogations. Nor do we find any support in the record for the allegation that police deliberately preyed upon Nobles in her drugged state—in fact, the record reflects

that they were unaware that Nobles had taken any medication at all, and they found her in complete control of herself. Even if we were to entertain the idea that Nobles was still impaired in the early evening by a Xanax pill that she had taken in the early morning, we must presume as a matter of law that she confessed voluntarily unless this weakness was deliberately exploited by the police. *State v. Harris* (Dec. 21, 1994), Montgomery App. No. 14343, unreported, 1994 WL 718227.

In short, we agree with the trial court that, even accepting Nobles's argument that her confession was the product of custodial interrogation, the record is devoid of any evidence of police overreaching in conducting that interrogation. Nobles's confession was voluntarily given, and the court did not err in overruling her motion to suppress it.

Nobles's eighth assignment of error is overruled.

## IX

"Appellant was denied equal protection under the law and a fair trial by the state's peremptory challenge of the only black juror on the prospective panel."

The state exercised its third peremptory challenge by asking the court to excuse venireman Dianne Johnson, who was the only potential juror who was black. Noting this, Nobles's defense counsel promptly raised a *Batson* challenge, which the court overruled.

Traditionally, peremptory challenges have enabled a party to cull from the veniremen any person he believed would be more likely to find for his opponent than for him, regardless of his reasons for thinking so. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, provides an exception to this general rule. Though the precise limits of the application of the *Batson* exception have yet to be defined (see *Powers v. Ohio* [1991], 499 U.S. 400, 429–430, 111 S.Ct. 1364, 1381, 113 L.Ed.2d 411, 438, Scalia, J., dissenting), it is at least well settled that the state may not use peremptory challenges against a venireman solely on the basis of her race. In analyzing the merits of a *Batson* challenge, a court follows the tripartite test articulated in *Batson,* as modified by *Powers, supra.* "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." (Citations omitted.) *Hernandez v. New York* (1991), 500 U.S. 352, 358–359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405.

Defense counsel attempted to make a prima facie showing that Johnson was challenged on the basis of her race by reference to the fact that she was challenged, and that she is black, more specifically, the only black venireman on the panel as it was then constituted. The court did not evaluate whether defense counsel had made a valid prima facie showing of unlawful discrimination before the prosecutor volunteered an explanation for his proposed challenge. "She's—we're excusing Ms. Johnson because she's a college student, no employment and somewhat of a close age to the defendant. And we would excuse her for those reasons, not for reasons of race, or color. The victim in this case is a black two year old." The court "note[d] the objection for the record and overrule[d] it."

■■ We will assume, for the sake of argument, that Nobles successfully met the first prong of the *Batson* test. Moving to the second prong, we note that the reasons offered by the state for excusing Johnson are not compelling, and certainly do not "correspond[ ] to a valid for-cause challenge." *Hernandez v. New York,* 500 U.S. at 363, 111 S.Ct. at 1868, 114 L.Ed.2d at 408. However, the race-neutral explanation offered by the prosecutor need not rise to the level of a challenge for cause. *Id.* Nor need it be "persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem* (1995), 514 U.S. ——, ——, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839–840, quoting *Hernandez v. New York, supra,* 500 U.S. at 360, 111 S.Ct. at 1866, 114 L.Ed.2d at 406.

■ We find no racially discriminatory intent inherent in the prosecutor's explanation that he did not want Johnson on the jury because she had some college education, and was young and unemployed, like the defendant.[2] This being the case, we proceed to review step three, in which the court weighed the merits of Nobles's challenge against the state's race-neutral explanation, and made a factual determination that Nobles, the opponent of the strike, had failed to carry her burden of proving discriminatory intent. See *Id.*

In denying that the state intentionally tried to eliminate blacks from the jury, the prosecutor pointed out that the murder victim was himself black. It was also the case that many of the state's important witnesses were black. The state

---

2. Nobles points out that the prosecutor never inquired into Johnson's youth or her employment status during voir dire, and suggests that the prosecutor padded his explanation with these reasons though they obviously did not concern him enough to question her about them. From the context of the entire proceeding, however, it appears that the prosecutor was examining the veniremen from questionnaires they each had filled out. These questionnaires would have indicated each venireman's employment status and age; there would have been no need to inquire further on those issues.

would have had little reason to eliminate from the jury anyone who might naturally feel more sympathetic toward the victim, or toward the witnesses, than non-black jurors would.

Johnson was the third venireman peremptorily challenged by the state. The first two individuals the state challenged, Sweeney and Mecoli, were white, but they shared several other characteristics with Johnson. They, like Johnson, were women with some post-high school education. Johnson was a senior at Central State, majoring in special education, Mecoli was working on a Ph.D. in Educational Leadership at Miami University, and Sweeney had finished up school while working at Society Bank during the previous year. Besides these three individuals, there were apparently no other women on the panel with a post-high school education. It seems from this pattern that the state had drawn up a juror profile that educated women did not fit. However, Nobles has not made a *Batson*-style equal protection challenge to protest the systematic exclusion of educated women from her jury. She has urged that Johnson was unlawfully challenged on the basis of her race.

A trial court's factual finding that the state did not exercise its peremptory challenges with a racially discriminatory intent "largely turn[s] on evaluation of credibility." *Batson v. Kentucky, supra,* 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. As a result, the trial court's determination is to be accorded great deference, and will not be disturbed on appeal unless, based on the record, it is clearly erroneous. *Hernandez v. New York, supra,* 500 U.S. at 364–365, 111 S.Ct. at 1869, 114 L.Ed.2d at 409; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, 1314. We conclude that the record in this case fully supports the trial court's finding that the state did not act with an unlawful discriminatory intent. "Apart from the prosecutor's demeanor, which of course we have no opportunity to review, the court could have relied on the facts that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge, * * * and that the ethnicity of the victims and prosecution witnesses tended to undercut any motive to exclude [members of the same minority ethnic group] from the jury. Any of these factors could be taken as evidence of the prosecutor's sincerity." *Hernandez, supra,* 500 U.S. at 369–370, 111 S.Ct. at 1872, 114 L.Ed.2d at 412.

Nobles's ninth assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

BROGAN, J., concurs.

GRADY, J., dissents in part.

GRADY, Judge, dissenting in part.

I agree that the *corpus delicti* rule required the state to prove by evidence independent of Nobles's confession that she had "treat[ed] a human corpse in a way that would outrage reasonable community standards." However, absent the confession, there is no evidence, direct or circumstantial, demonstrating how Nobles might have concealed or disposed of her son's body. On that record a jury could not find, beyond a reasonable doubt, that the standards of a reasonable community would be outraged by Nobles's treatment of her son's corpse. I would sustain the second assignment of error in that respect, but would overrule the assignment and affirm the conviction of murder for the reasons explained by Judge Young.