OPINION
Defendant-Appellant Terry Thomas was indicted on one count of complicity to possession of cocaine and one count of trafficking in cocaine. Following a jury trial, Thomas was found guilty of the complicity to possession and acquitted of the trafficking charge. As a result of this verdict, Thomas was sentenced to five years in prison and a $5000 fine. Thomas timely appealed and filed a brief with this court, but the state did not favor this court with a responsive brief. Thomas has raised the following assignments of error in his appeal:
 I. The trial court erred to the prejudice of Appellant's right to due Process [sic] by prematurely and coercively instructing the jury pursuant to State v. Howard where the jury was not deadlocked on the issue of guilt or acquittal.
 II. The trial court violated Appellant's rights under the U.S. Const. Amend. VI, XIV and Ohio Const. Art. I, § 16, when it found him guilty of complicity to possession of cocaine equal to or greater than 25 grams, when that finding was against the manifest weight of the evidence.
 III. The Defendant-Appellant was denied his rights to a fair and just trial as guaranteed by the U.S. Const. Amend. VI, XIV; Ohio Const. Art. I sec. 1, 2, 5, 9, 10, 16, and 20.
 IV. The cumulative effect of the errors produced a trial setting that was fundamentally unfair, thereby denying Appellant due process of law. U.S. Const. Amend. XIV; Section 16, Article I, Ohio Const.
 I
In his first assignment of error, Thomas challenges the trial court's decision to give a State v. Howard instruction to the jury. In State v. Howard, the Ohio Supreme Court set forth an appropriate supplemental instruction for a trial court to read to a jury that has become deadlocked, which basically encourages the jury to reach a verdict. (1989), 42 Ohio St.3d 18. In this case, the jury sent out a question after approximately five hours of deliberation which asked, "what happens on a hung jury?" In response to this question, the court read the following instruction, which is virtually identical to the approved supplemental instruction proposed in Howard:
 In a large portion of cases absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of other jurors, each question submitted to you should be examined with proper regard and deference to the opinions of others.
 It is desirable that the case be decided. You are selected in the same manner and from the same source as any future juror would be — jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side.
 It is your duty to decide the case if you can conscientiously do so. You should listen to one another's opinions with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions [given] that a unanimous verdict has not been reached.
 Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others equally honest, who have heard the same evidence with the same desire to arrive at the truth and under the same oath.
 Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.
After reading this instruction and answering one more question, the court informed the jury that it was five minutes after six, and they would be allowed to deliberate about twenty-five minutes more that evening, unless the jury expressed another preference. The jury came back with a verdict approximately thirty minutes later.
A trial court's decision whether and when to give a Howard instruction is within its sound discretion. State v. King (Mar. 22, 2000), Mahoning App. No. 95 CA 163, unreported, at p. 5, citing State v. Ballew (Feb. 26, 1999), Hamilton App. No. C-980442, unreported, at p. 2; State v. Fannin (Dec. 12, 1995), Franklin App. No. 95APA05-560, unreported, at p. 4. This decision will not be reversed absent an abuse of that discretion, which implies an arbitrary, unreasonable or unconscionable attitude by the trial court. State ex rel. Wilke v. Hamilton Cty. Bd. of Commrs. (2000),90 Ohio St.3d 55, 61.
Thomas argues first that the instruction was premature because the jury was not deadlocked at that point. It is not clear to this court whether the jury's question signified that they were deadlocked. The better practice would have been for the trial court to ask the jury foreman if they were actually deadlocked. However, there is no bright line rule to determine when a jury is actually deadlocked in order to give the Howard instruction. State v. Long (Oct. 12, 2000), Cuyahoga App. No. 77272, unreported, at p. 9, citing State v. Minnis (Feb. 11, 1992), Franklin App. No. 91AP-844, unreported. In fact, one court found no error when the trial court failed to make a finding on the record that the jury was irreconcilably deadlocked prior to reading the instruction. State v. Martens (1993), 90 Ohio App.3d 338, 343. In Martens, the jury asked the question, "How long is a reasonable time before we are considered a hung jury? We are still very divided in our opinions." In response to that question, the trial court read the Howard instruction. The Martens court found the trial court did not abuse its discretion in giving the Howard instruction at that time. Id. at 342.
After reading the question raised by the jury, the trial court may have concluded from the nature of the question that the jury was deadlocked. Accordingly, we do not feel the trial court abused its discretion in giving the Howard instruction at that time.
Second, Thomas argues that the time limitation given to the jury following the instruction was coercive. In State v. King, after reading the Howard instruction, the court informed the jury it was "going to let you deliberate for a length of time, and you let us know prior to the noon hour." Mahoning App. No. 95 CA 163, at p. 6. The appellate court found that the court's statement to the jury did not set a deadline for a verdict, but instead asked the jury to advise the court before noon if it was still deadlocked. The King court further pointed out that the court's instructions must not be examined piece by piece, but should be reviewed as a whole in the proper context. Id.
We find the comment by the court below setting a "time limit" was not coercive. The court made it clear that the time suggested was to recess for the evening, unless the jury had another preference. The court's statement did not preclude the jury from continuing deliberations later into the evening if it so desired. Moreover, it was clear that it could return the next day to continue deliberations if it had not reached a verdict. Based on the foregoing, we do not find any abuse of discretion by the trial court surrounding the Howard instruction. Thomas' first assignment of error is overruled.
 II
Thomas next argues the jury's verdict was against the manifest weight of the evidence. When reviewing a manifest weight claim, the appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387. A verdict should only be overturned in extraordinary situations when evidence weighs heavily against the conviction. Id. The facts in the record are as follows:
 In the late evening hours of June 25, 1999 and into the early morning hours of June 26, 1999, a confidential informant working for the police, Carol Banta, twice entered an apartment at 928 E. Pleasant Street and purchased crack cocaine. She reported to the police and testified at trial that there were four men and one woman in the apartment. She actually purchased the crack from Damion Jones, but also present were Frank Allen, Terry Thomas, Patricia Diezel, and Clifford Mays.
Soon after the second controlled buy, the police obtained a search warrant for this address and executed same. When the police entered the residence, Thomas was in the kitchen and immediately dropped to the ground pursuant to the officers' demands. In the meantime, Jones was attempting to flush money down the toilet, while Allen was throwing crack, along with an air conditioning unit, out the window. This air conditioning unit landed on one of the police officers, breaking his foot. The money recovered from the bathroom included the money used for Banta's controlled buy.
Diezel, who resided in the apartment, was charged with permitting drug abuse, and testified at trial pursuant to a plea agreement which allowed a reduction to an unspecified charge. She claimed that she was approached by an individual referred to as Betty Boop and asked if some men could use her apartment to deal drugs. Diezel, who was an admitted crack addict, claimed she said no. But upon return to her apartment after purchasing cigarettes, she found Jones and Allen in her apartment. They told her they were taking over, and she needed to stay in her room in exchange for twenty dollars and some crack. She then spent most of the evening smoking crack in her room. The only times she saw Thomas that evening were once when he gave her some crack and once sitting on the couch with a pile of crack in front of him on the coffee table. Testimony revealed all of the individuals in the apartment were arrested that evening, with the possible exception of Mays. Thomas, originally charged with felony drug abuse, bonded out shortly after his arrest.
A few days later, on June 29, the police executed another controlled buy at 1444 Delta Road, Apartment F, with Thomas as the target. Banta testified that she purchased crack from Thomas on that day, just outside Apartment F in the hallway. However, no police officer could testify that Thomas was actually there. The jury found Thomas not guilty of the trafficking charge relating to this buy.
The jury found Thomas guilty of complicity to possession of crack cocaine in excess of twenty-five grams pertaining to the June 26, 1999 controlled buy and search. In relation to this conviction, Thomas was found to have violated R.C. 2925.11 and 2923.03. R.C. 2923.03 states:
 "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense;
 (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code * * *."
R.C.2925.11 makes it a first degree felony to knowingly obtain, possess or use in excess of twenty-five grams but less than one hundred grams of crack cocaine.
Possession is defined in the statute as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). However, constructive possession is sufficient to violate R.C. 2925.11. State v. Brooks (1996),113 Ohio App.3d 88, 90, citing State v. Haynes (1971), 25 Ohio St.2d 264,269-70. To establish constructive possession, physical contact with the substance is not important, but instead the defendant's ability to exercise dominion and control over it. Id., citing State v. Wolery (1976), 46 Ohio St.2d 316, 332. Although constructive possession cannot be established by mere presence in the apartment, readily available drugs in close proximity can be sufficient circumstantial evidence to demonstrate constructive possession. Id., citing State v. Barr (1993),86 Ohio App.3d 227, 235.
Based on the testimony elicited at trial, the jury could have reasonably concluded that Thomas violated R.C. 2923.03 and 2925.11. First, the supreme court has recognized when you have a residence established as a crack house, there is an overwhelming probability that anyone present in the house is in possession of the drug or some contraband. State v. Kinney (1998), 83 Ohio St.3d 85, 90. Several officers testified that they considered this a crack house based on the controlled buys, the constant flow of people in and out, and of course the presence of a large amount of crack and money.
Testimony revealed that Thomas was in the residence at the time the drugs were being sold, and was wearing only pants or shorts, no shirt. In addition, Diezel testified that Thomas was at the residence much of the evening. She stated that he brought her crack on one occasion and then she saw him sitting on the couch with crack on the table in front of him. Certainly, Thomas was able to exercise dominion or control over the drug. Therefore, it was not against the manifest weight of the evidence for the jury to find that Thomas was guilty of complicity to possession of crack cocaine. Accordingly, Thomas' second assignment of error is overruled.
 III
In his third assignment of error, Thomas raises four issues for review in his argument that he was denied his right to a fair and just trial. His first issue alleges that the state introduced irrelevant, prejudicial and cumulative evidence at trial. Specifically, Thomas challenges the introduction of the gun, marijuana, a headset supposedly used by lookouts in drug operations, and the prior arrest of codefendants. The gun and the prior arrest were completely related to two of the other individuals arrested that night, Damion Jones and Frank Allen. And no one was charged with possession of the marijuana found at the scene. Further, the evidence regarding the headset included testimony from one of the officers that he saw an individual outside the building that "could have" been a lookout, and "could have" been wearing the same type of headset as found in the residence.
Evid.R. 403(A) prohibits admission of evidence if its probative value is "substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." All of the evidence challenged by Thomas, although not overtly related to him, was relevant to demonstrate that this residence was used as a crack house, to sell drugs. As we stated before, the existence of a "crack house" increases the likelihood that individuals inside are not only cognizant of the activities, but are likely in at least constructive possession of the drugs or some contraband. See Kinney, supra. Also, because Thomas was charged with complicity to possession, evidence regarding the principals of the offense, Jones and Allen, is relevant to the charge.
Moreover, we do not believe the potential for prejudice from this evidence outweighed the probative value. Every witness that testified regarding the gun, the marijuana and the headset, all clearly indicated that Thomas was not directly associated with any of those things. In addition, witnesses confirmed that Thomas was not involved with Jones' and Allen's prior arrest at Delta Road.
The only questionable issue is the prosecutor's statement that Thomas was present at the controlled buy which resulted in Jones' and Allen's prior arrest. This fact was not in evidence. In fact, the testimony revealed that he was not present during that controlled buy. However, there was no objection to this statement at trial, and therefore, the issue cannot be reversed on appeal absent plain error. State v. Lindsey (2000), 87 Ohio St.3d 479, 482. Under the plain error standard, "reversal is warranted only if the outcome of the trial clearly would have been different absent the error." Id. We are unpersuaded that one comment by the prosecutor, which was refuted by the evidence, swayed the jury enough to change the outcome of the trial. Based on the foregoing, we find Thomas' first issue for review under this assignment of error not well taken.
In his second issue for review, Thomas contends that the court-ordered disclosure of confidential informant information was incomplete and misleading. We will address this together with part of Thomas' fourth issue in which he claims his presentation of relevant evidence was limited by the prosecutor's failure to timely and properly disclose this information.
Carol Banta was the confidential informant used by police in several controlled buys discussed during Thomas' trial, including the ones leading up to the search and arrest on June 26, 1999. Although her name and social security number were provided to the defense prior to trial, the defense discovered immediately before trial that the social security number matched a Carol Bundy instead of Carol Banta. After further investigation during the trial, the defense discovered the confidential informant's correct social security number, which revealed a criminal history.
Crim.R. 16(B)(1)(e) requires the state to disclose the names, addresses and criminal records of all witnesses upon motion of the defendant. Moreover, the suppression of any evidence favorable to the defendant which is material to guilt or punishment violates the defendant's due process, regardless of the good faith or bad faith of the state. State v. Barzacchini (1994), 98 Ohio App.3d 440, 53-54, citing Brady v. Maryland (1963), 373 U.S. 83, 87. Since Brady, this rule has been extended to impeachment evidence. Id., citing United States v. Bagley (1985),473 U.S. 667. "[S]uch evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Johnston (1988), 39 Ohio St.3d 48, paragraph five of the syllabus.
In this case, the court had ordered a Crim.R. 16(B) disclosure following a defense motion. Had Thomas been provided Banta's correct social security number prior to trial, he would have had time to argue his ability to use all of her prior convictions for impeachment. Included in this criminal history was the trafficking charge she plead to resulting in her work as a confidential informant, a grand theft from 1983, and two misdemeanor thefts within the past ten years. However, the misdemeanor thefts contained some technical deficiencies, which the court found negated their validity. The trial court allowed examination on the trafficking charge and the grand theft, but not on the misdemeanor thefts due to their deficiencies. Thomas claims this was error. We agree.
Although never cited below, it appears that the state and the trial court relied on our case of State v. Murray, (Feb. 9, 1994), Clark App. No. 3071, unreported, to support their theory that the prior misdemeanors could not be used for impeachment. We found in Murray that because the state chose to prove the crime of probation violation by alleging the defendant actually was convicted of a crime, proof of a valid conviction became an element of the crime. Because the conviction was an element of the crime, the state had the burden to prove the prior conviction met the journalization requirements of Crim.R. 32(C). Id. at p. 2. Otherwise, the prior conviction was not considered valid.
In contrast, in State v. Ervin, this court addressed the issue of technical deficiencies in journalizing convictions as applied to enhancing DUI sentences. (Feb. 4, 2000), Clark App. No. 99 CA 44, unreported. When sentencing for a DUI conviction, a court may enhance an individual's sentence based on the number of prior convictions that individual has had in the past six years. Because prior convictions are not actually an element of the offense, the state does not have the burden to prove their validity. Id. at p. 4. Instead, when examining prior convictions to determine sentence on a DUI conviction, the court may presume the validity of the defendant's prior criminal record. The defendant then has the burden to prove any deficiencies. We held in Ervin that a technical deficiency in journalizing the conviction was insufficient to meet this burden, reasoning that a technical deficiency in paperwork did not negate the fact that the defendant committed the prior act for which he was convicted. Therefore, the court could use the technically-deficient prior convictions to enhance Ervin's sentence. Id. In an attempt to reconcile Murray and Ervin, we find that the technical deficiency of a prior conviction only negates its validity when the prior conviction is an actual element of the crime the state has the burden to prove.
In the present case, Thomas wanted to use Banta's prior convictions for purposes of impeachment. Certainly, if the state does not have to prove the validity of a prior conviction for a defendant's sentence enhancement, a defendant would not have to do so to impeach a state's witness. Instead, the court could presume its validity based on the witness' criminal record. The record below suggests that Banta had two prior misdemeanor theft convictions which had technical deficiencies in the journalization. The state did not try to argue that Banta did not commit these crimes or that she was not convicted of them. As in Ervin, a technical deficiency is insufficient to prevent their use. Therefore, we find the trial court erred in preventing the use of the two misdemeanor thefts for impeachment. We next must decide whether this error was prejudicial.
The improper admission or exclusion of evidence only results in prejudicial error if a substantial right of the defendant has been affected. Evid.R. 103(A); State v. Nobles (1995), 106 Ohio App.3d 246,277. To determine if a substantial right has been affected, we must ask, but for the error, would the jury probably have made the same decision." Cappara v. Schibley (1999), 85 Ohio St.3d 403, 709 N.E.2d 117, 121.
Banta testified that she originally performed the role of confidential informant as part of a plea agreement for a drug trafficking charge. After she had worked off that agreement, she was then paid by the police for each controlled buy. Further, once defense counsel learned of Banta's prior record, she was recalled to the stand and questioned about the grand theft conviction from 1983. This testimony sufficiently brought into question Banta's credibility. We do not believe that adding testimony of two misdemeanor thefts would have significantly influenced the jury's opinions about her credibility. Furthermore, we note that the jury acquitted Thomas of the trafficking charge which was supported only by Banta's testimony, since no one else could testify to his presence at that controlled buy. This indicates the jury did not believe Banta's testimony, at least regarding the June 29 controlled buy. Hence, we believe that the jury's outcome would not have been different had the defense been allowed to question Banta about her two prior misdemeanors. Accordingly, this issue for review is not well taken.
Third, Thomas argues the prosecutor acted improperly by vouching for two state's witnesses during his closing argument. The statements made by the prosecutor, in complete context, were as follows:
 [Diezel's] testimony is corroborated by a number of things. That, for one, she tells you about a gun that is shown to her, an implicit threat at least. We've taken over this house now. Everything that she tells you, you know that you can trust because of the other evidence that you have been presented.
* * *
 [Banta] also tells you that she sees Patricia and Snake, and we know that Patricia and Snake are also in there as well. And we also find when we execute this search warrant not only the same substance that she has been able to purchase and bring back to the police, but the $80 of her controlled buy money. She did what she was asked to do. She did it in a reliable fashion, and you can trust her testimony when she says that she made these purchases from this house and the events surrounding that.
Initially, we recognize that "[i]t is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." State v. Williams (1997),79 Ohio St.3d 1, 12. However, the prosecutor may properly comment on the credibility of witnesses based on their testimony in court. State v. Carpenter (1996), 116 Ohio App.3d 615, 624. In other words, a prosecutor cannot say, "I believe my witnesses told the truth," but he can say, "other evidence demonstrates my witnesses told the truth." See, State v. Draughn (1992), 76 Ohio App.3d 664, 670. To determine whether the remarks rose to the level of prosecutorial misconduct, we must find that they were improper, and if so, that they "prejudicially affected substantial rights of the defendant." State v. Smith (1984), 14 Ohio St.3d 13, 14.
We do not find the prosecutor's remarks improper in this case, as they did not express his personal belief. He pointed out evidence to the jury that supported the witnesses' testimony, and then argued that based on the other evidence, their testimony could be trusted. This type of credibility bolstering is not improper. Accordingly, Thomas' third issue for review is not well taken.
In his final issue for review in this assignment of error, Thomas generally alleges that the trial court and the prosecutor limited his presentation of relevant evidence, denying his right to a meaningful defense. Specifically, Thomas contends the trial court and the prosecutor prevented further inquiry into allegations of witness interference with Patricia Diezel.
Thomas alleges that the trial court erred in refusing to allow or to conduct a voir dire of Diezel regarding an incident at an earlier consensual meeting. The allegation involved the prosecutor's interruption of a meeting between Diezel and defense counsel and thereafter, Diezel's refusal to speak with defense counsel. Thomas argues that the trial court should have questioned the witness about it at the time of the allegation, prior to trial, but that the trial court refused.
In his brief, Thomas alleges that his request for an investigation occurred "at an earlier hearing on the record." It appears from the record that a hearing was conducted by the trial court on April 12, 2000. However, the record contains no transcript of this proceeding, and no indication aside from Thomas' brief as to what was discussed at this hearing. Unfortunately, we are confined to consider only the record presented to us on appeal. App.R. 12(A)(1)(b); State v. Kelley (1991),57 Ohio St.3d 127, 130. Because we have no record of any denial by the trial court to investigate the allegations of witness tampering, we must decide the issue based on what occurred at trial.
While Diezel was on the stand, defense counsel asked her the following question regarding this prior consensual meeting:
 Q. And the Prosecutor didn't want you to talk to me about Terry Thomas anymore, did he?
A. Yeah.
It is unclear to this court what Diezel's intended response to this question was. During redirect examination, the following discussion occurred regarding the same encounter:
Q. Would you tell the jurors why you were crying that day?
 A. Because I felt that I — it was necessary for me to talk to him.
 Q. When you say you felt it was necessary for you to talk to him, what do you mean by that?
A. I felt that I had to.
Q. That you had to.
A. Yes.
Q. Did you want to speak with him then?
A. No.
 Q. Did you tell him, "I don't want to speak with you, Mr. O'Brien?
A. No.
Q. Was that upsetting you that you were doing that?
A. Yes.
 Q. Did I ever tell you or indicate to you in any way that I was not happy with you speaking with [the defense counsel]?
A. No.
 Q. Do you remember what, if anything, I did tell you about whether you should talk with him or not?
A. The only thing that you said is it was my choice.
The supreme court has held that a state's witness who will be testifying at trial has the right to refuse to speak with defense counsel prior to trial, provided "the prosecution has not unduly interfered with the witness' free choice." State v. Zeh (1987), 31 Ohio St.3d 99, 105. Furthermore, the supreme court has implied that a defendant cannot demonstrate prejudice through lack of access to a witness prior to trial if he has access to the witness at trial. State v. Green (2000),90 Ohio St.3d 352, 373. Based on the record, it appears the prosecutor properly advised Diezel that she had a choice not to speak to the defense counsel, and she decided not to do so. We find the defendant has not established any prejudice, and therefore, no constitutional violation exists. Thomas' fourth issue for review is not well taken.
Based on the foregoing discussion in all issues for review, Thomas' third assignment of error is overruled.
 IV
In his final assignment of error, Thomas argues that even if some of the errors alleged were harmless by themselves, when taken together, their cumulative effect resulted in an unfair trial. It is true that when considered together, separately harmless errors may violate a defendant's right to a fair trial. State v. Madrigal (2000), 87 Ohio St.3d 378, 397. In order to determine if "cumulative" error is present, we must first find that multiple errors were committed at trial. Id. at 398. Next, we must find there is a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors.
State v. Johnson (Nov. 24, 2000), Hamilton App. No. C-990905, unreported, at p. 2, citing State v. Moreland (1990), 50 Ohio St.3d 58,69. After all, a defendant is guaranteed a fair trial, not a perfect one. State v. Lott (1990), 51 Ohio St.3d 160, 166.
After reviewing all of the errors alleged by Thomas, we found none to be prejudicial, and only one to be harmless error: the trial court's failure to allow the defense to cross examine Banta about her two prior misdemeanor convictions. Because there was only one harmless error, cumulative error is impossible. Accordingly, Thomas' fourth assignment of error is overruled.
Judgment affirmed.
WOLFF, P.J., and GRADY, J., concur.