OPINION
Defendant-appellant, Donovan E. Simpson, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of thirteen criminal charges and sentencing him accordingly.
In the early morning hours of October 27, 1997, a fire broke out at 151 South Wheatland Avenue in Columbus, Ohio. At the time, Aleta Bell and three of her four children, Shenequa, age five, Elijah, age three, and Myesha, five-months old, were asleep in the house. Also sleeping in the house were two men, Terrance Hall and Gary Williams, Myesha's father. Hall was awakened early that morning by a loud crash of glass. He found the house engulfed in flames. After running out of the house, Hall was able to wake Aleta Bell and Williams, who were sleeping with Myesha in the same room. They were able to get out of the house. Unfortunately, they were not able to reach the two children who were sleeping in a back bedroom. Members of the Columbus Fire Department ("CFD") arrived on the scene and were able to find the two children and take them directly to Children's Hospital. However, as a result of the injuries sustained in the fire, Shenequa Bell died days later. Elijah Bell survived, but suffered serious injuries.
By indictment filed August 24, 2000, appellant was charged with thirteen counts relating to the fire at 151 South Wheatland Avenue. Appellant was charged with two counts of aggravated murder for the death of Shenequa Bell, in violation of R.C. 2903.01. Both counts contained death penalty specifications pursuant to R.C. 2929.04(A). Appellant was also charged with five counts of attempted murder of the five other people in the house, in violation of R.C. 2923.02 and 2903.02; one count of aggravated arson, in violation of R.C. 2909.02; and five counts of felonious assault, in violation of R.C. 2903.11. Appellant entered a not guilty plea to all of the charges and proceeded to a jury trial.
Before his trial, appellant sought to suppress four verbal statements he made to police officers prior to being indicted. Two of these statements, one on April 24 and another on April 27, 2000, were made to officers while appellant was incarcerated in the Licking Southeastern Correctional Institution for an unrelated crime. Both of these statements were recorded. No Miranda warnings were given to appellant before he made these statements. The other two statements, one on June 16 and one on June 20, 2000, were made at Columbus Police Headquarters. Both of these statements (which were essentially confessions) were videotaped. Appellant was read his Miranda rights before these statements were made and he signed a form indicating he understood and waived those rights. After an evidentiary hearing, the trial court denied his motion thereby permitting the state to introduce these statements into evidence at trial.
The following key testimony was presented during the state's case. CFD Battalion Chief Tom Hackett was the first fire fighter to arrive at the scene of the fire. He testified that, when he arrived, there was a male and a female with a small infant on the front roof of the house. He stated that, when water from the fire hoses hit the fire, the fire flashed back, which was not typical. Hackett testified that a fire flashback under these circumstances was consistent with the presence of a flammable liquid. It was his impression from the size of this fire and the time it took to extinguish it that the fire was intentionally set.
After the fire was extinguished, Kenyon Beavers, a dog handler for the CFD, testified that he went to the scene with his dog to search through the first floor of the house for traces of flammable liquids. Beavers and the dog walked through the first floor from the back to the front of the house. In the front of the house, in the living room right inside a large window, the dog gave a "primary alert" (i.e., an indication that the dog detected the presence of a flammable liquid). After searching the rest of the room, Beavers took the dog outside, where the dog gave another "primary alert," this time on the porch directly outside the large window in the living room. On cross-examination, Beavers admitted that surface samples taken from the areas where his dog had indicated the primary alerts did not show the presence of an accelerant when tested.
Billy Reedus, a CFD investigator who investigated the fire, testified that he arrived at the scene after the fire was extinguished. Upon arrival, it was obvious to him that the fire damage was centered in the living room and that the fire's point of origin was in that room. Specifically, he testified that the fire started in the area below the large window in the living room. He also saw a pattern of fire damage in the house that was consistent with the presence of some sort of accelerant at the origin of the fire. He then eliminated likely accidental causes of a fire, such as electrical, weather and cigarettes, to arrive at his conclusion that the fire was intentionally set. He further concluded that the fire had been set by a Molotov cocktail that was thrown through the large window in the living room. Reedus testified that a Molotov cocktail consists of a glass bottle filled with a flammable liquid, such as gasoline or alcohol. A wick of some sort is then placed in the bottle and set on fire. The bottle is thrown at the structure causing the bottle to break on impact. The fire spreads through the spreading accelerant. Although he could find no definite physical evidence of a Molotov cocktail, Reedus concluded that one had been thrown through the large living room window to start the fire.
Detective Edward Kallay, Jr., a homicide detective who was the primary investigator in this matter for the Columbus Police Department ("CPD"), testified that, in January 2000, he had a conversation with a man named Adiyat Diggs. Based upon that conversation, Kallay believed that appellant might have information about a suspect who the police thought could have been involved in starting this fire. On April 24, 2000, Detective Kallay and Federal Special Agent Ozbolt spoke with appellant at the Southeastern Correctional Institution in Licking County where appellant was incarcerated. Their conversation was recorded.
Detective Kallay testified that appellant told him that he had picked up a man named Daryl "Pumpkin" Kelly the day before the fire and took him to a bar to meet a woman named Leah.[1] Appellant waited outside while Daryl Kelly went into the bar. When Kelly and Leah came out, appellant heard Leah tell Kelly to "take care of this for me." Appellant told Detective Kallay that he got a call from an excited Daryl Kelly the next morning who said he needed another ride. When appellant picked Kelly up, he said that Kelly smelled like gasoline. Daryl "Pumpkin" Kelly was a suspect even before appellant provided this information.
Three days later, on April 27, 2000, Detective Kallay and Special Agent Ozbolt went to the Southeastern Correctional Institution to talk with appellant again. In a recorded conversation, appellant again implicated Leah and Kelly in the fire at 151 South Wheatland Avenue. Following this conversation, the officers obtained appellant's release on probation so that he would cooperate with them in their investigation. However, appellant failed to cooperate, leading the officers to believe that appellant had more to do with the fire than he was admitting. Due to appellant's failure to cooperate with the investigation and failure to abide by the terms of his probation, Detective Kallay arrested appellant on June 16, 2000.
After he was arrested, appellant was taken to CPD headquarters and interrogated by Detective Kallay and Special Agent Ozbolt. The interrogation was videotaped. It is undisputed that, prior to being questioned, appellant was read his Miranda rights. During questioning, appellant admitted his involvement in starting the fire. He said that he met Leah and Kelly the day before the fire when Leah asked appellant to take Kelly somewhere that night. Later that evening, Kelly and appellant took two empty bottles of alcohol and filled them with gasoline. They brought the bottles to Leah who showed them how to make a Molotov cocktail. Appellant and Kelly then went to the area of 151 South Wheatland Avenue and drove into an alley. After smoking some crack, Kelly got out of the car with the two bottles and, a few seconds later, appellant heard glass break and then saw Kelly running back towards the car without the bottles. The two sped away to a crack house, where they paged Leah. She arrived and paid them both with crack cocaine.
Detective Kallay further testified that, following these admissions, he made arrangements to have appellant take a polygraph test. On June 20, 2000, appellant was brought again to the CPD to take the test. It is undisputed that appellant was read his Miranda rights again. However, Detective Kallay testified that appellant was uncooperative so the test could not be performed. Appellant's lack of cooperation was confirmed by the testimony of Randy Walker, who had been hired to administer the test. Nevertheless, while in the room waiting to take the test, appellant made more admissions regarding his involvement in the fire. Again, this interrogation was videotaped.
Appellant's recorded statements of April 24th, April 27th and his videotaped confessions of June 16th and June 20th were played for the jury over appellant's objections.
The state then called Stanley Bowen, a Deputy Sheriff for Licking County. Deputy Bowen was employed as a supervisor at the jail in which appellant was incarcerated in April 2000. Deputy Bowen testified that he overheard appellant ask "why didn't they charge the bitch too. It was her idea to start the fire." In addition, an inmate, who was in a cell next to appellant, testified that appellant told him all about the fire. He said that appellant told him there were three people involved, and that they used Molotov cocktails to firebomb the house.
At the conclusion of the state's case, appellant orally moved, pursuant to Crim.R. 29, for a judgment of acquittal on the entire indictment, based upon the state's alleged failure to prove the requisite mens rea. The trial court denied the motion. Appellant then was advised of his constitutional rights regarding his own testimony and he did not testify. The defense rested its case without presenting any witness and renewed its motion for judgment of acquittal, which again was denied by the trial court.
After deliberating, the jury returned verdicts finding appellant guilty of all five counts of attempted murder and felonious assault, guilty of one count of aggravated arson, guilty of the lesser included offense of murder of Shenequa Bell, and guilty of the aggravated felony-murder of Shenequa Bell, also finding appellant guilty of the death penalty specification because the aggravated murder was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons.
Subsequently, a mitigation hearing was held to determine the proper penalty for the death penalty count of the indictment. The jury found that the aggravating circumstances of the crime did not outweigh the mitigating circumstances beyond a reasonable doubt and, therefore, voted to impose a sentence of life imprisonment without parole eligibility for thirty years. The trial court sentenced appellant on all counts to a total of 90 years in prison.
Appellant appeals, assigning the following errors:
Assignment of Error No. 1
 THE TRIAL COURT ERRED WHEN IT FAILED TO CONDUCT AN INQUIRY OF APPELANT AFTER IT DISCOVERED THAT DEFENSE COUNSEL LABORED UNDER A CONFLICT OF INTEREST.
Assignment of Error No. 2
 THE TRIAL COURT ERRED WHEN IT ADMITTED PRETRIAL STATEMENTS MADE BY APPELLANT DURING CUSTODIAL INTERROGATION IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSITUTION.
Assignment of Error No. 3
 THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED UNRELIABLE EXPERT TESTIMONY BY FIRE DEPARTMENT PERSONNEL.
Assignment of Error No. 4
 THE TRIAL COURT ERRED IN ADMITTING APPELLANT'S PURPOTED CONFESSIONS ABSENT EVIDENCE OF THE CORPUS DELICTI.
Assignment of Error No. 5
 TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN THEY FAILED TO REQUEST OR UTILIZE AN EXPERT IN THE FIELD OF FALSE CONFESSIONS.
Assignment of Error No. 6
 THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL BECAUSE THERE WAS INSUFFICIENT EVIDENCE OF PURPOSE.
Assignment of Error No. 7
 THE TRIAL COURT ERRED IN ADMITTING HEARSAY TESTIMONY FROM A WITNESS THAT WAS UNAVAILABLE.
Assignment of Error No. 8
 THE TRIAL COURT ERRED IN DENYING A MOTION FOR A MISTRIAL AND PERMITTING THE PROSECUTION TO DISPLAY A GRUESOME PHOTOGRAPH TO THE JURY.
Assignment of Error No. 9
 THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY ON THE USE OF 404(b) EVIDENCE.
Assignment of Error No. 10
 TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN THEY FAILED TO OPPOSE A REQUEST BY THE JURY DURING DELIBERATIONS TO REPLAY TAPE RECORDINGS OF DEFENDANT'S STATEMENTS.
Assignment of Error No. 11
 THE TRIAL COURT ERRED WHEN IT FAILED TO MAKE THE REQUISITE FINDINGS TO SUPPORT MAXMIUM AND CONSECUTIVE SENTENCES UNDER R.C. § 2929.14(E).
For ease of analysis, appellant's assignments of error will be addressed out of order.
Without question, the most incriminating evidence presented against appellant at trial were his own statements. In his second assignment of error, appellant contends that the trial court erred in admitting the four statements he made to the police. These statements will be addressed in two groups the April statements and the June statements.
Before a suspect may be subjected to a custodial interrogation, he must be advised that he has the right to remain silent, that his statements can be used against him and that he has the right to consult with or have an attorney present. Miranda v. Arizona (1966), 384 U.S. 436, 467-471. Appellant's April statements were made to officers while he was incarcerated but were not preceded by Miranda warnings. Although the Miranda warnings were not given to appellant before his April statements, the state argues that notifying appellant of these rights was not required because appellant was not the subject of a custodial interrogation at that time.
Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. A person is considered in custody for purposes of Miranda when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest. Minnesota v. Murphy (1984), 465 U.S. 420,434. When determining whether an individual is in custody, the relevant inquiry is whether a reasonable person in the individual's position would have believed that he or she was not free to leave given the totality of the circumstances. Berkemer v. McCarty (1984), 468 U.S. 420, 442; State v. Gumm (1995), 73 Ohio St.3d 413, 429.
The state correctly points out that this "freedom to leave" analysis is inapplicable when questioning individuals such as appellant who were already in prison, because they are obviously not free to leave in the normal sense. Cervantes v. Walker (C.A.9, 1978), 589 F.2d 424,427-428; United States v. Conley (C.A.4, 1985), 779 F.2d 970, 972-973; Garcia v. Singletary (C.A.11, 1994), 13 F.3d 1487, 1490-1492; United States v. Ozuna (C.A.6, 1999), 170 F.3d 654, 658 n. 3. In these cases, courts require Miranda warnings if there is any "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." Cervantes, supra, at 428; Conley, supra, at 973. The majority of Ohio courts that have addressed this issue have followed that reasoning. State v. Peeples (1994), 94 Ohio App.3d 34, 41-42; State v. Farrell (1999), Miami App. No. 99-CA-24; but, see, State v. Holt (1997), 132 Ohio App.3d 601, 606.
We agree with the majority of courts, which conclude that Miranda warnings must be given to individuals in prison before questioning only when there is some added restriction on the prisoner's already restricted freedom. To adopt appellant's reasoning would require Miranda warnings whenever a prisoner is questioned, regardless of the circumstances. Such a rule would give a prisoner greater rights than the prisoner would have were he or she not in prison. Therefore, we reject appellant's contention that he was in custody for purposes of Miranda merely because he was incarcerated.
In determining whether there was some additional restriction on a prisoner's freedom, the Cervantes court looked at four factors: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which he is confronted with evidence of his guilt; and (4) the additional pressure exerted to detain him. Cervantes, supra, at 428. In reviewing appellant's April statements, the only evidence describing the circumstances of the questioning was testimony from Detective Kallay and the recorded statements themselves. The conversations were held in an office in the jail. The April 24th
meeting lasted almost an hour and the April 27th meeting lasted a little more than a half an hour. Detective Kallay described the conversations as amicable, without any threatening or intimidating language. The officers did not, at that time, see appellant as a suspect. They sought him out after he was identified as someone who might have information about the individual who the police considered a suspect. The officers told appellant many times in both conversations that they were there to get information about Kelly. Appellant was not confronted with any evidence suggesting that he may have been involved in the fire.
It does not appear from the record that appellant was placed under any additional restriction of his freedom during the April meetings. The questioning officer did not use coercion or threats and appellant was not a suspect in their investigation at that time. Accordingly, we conclude that appellant was not in custody for purposes of Miranda, when he spoke with police officers in April and, therefore, he was not entitled to Miranda warnings before he was questioned by the officers.
Even if we were to find appellant was in custody at the time of questioning and the officers should have given appellant Miranda warnings, the admission of the April statements would be harmless error. Arizona v. Fulminante (1991), 499 U.S. 279, 310 (harmless error doctrine applies to Miranda violations); State v. Edgell (1972), 30 Ohio St.2d 103,110. An error in the admission of evidence is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt. State v. Williams (1983),6 Ohio St.3d 281.
It should be noted that appellant's April statements did not implicate him in these crimes. State v. Lee (1997), Trumbull App. No. 95-T-5371 (finding harmless error in admission of defendant's statement that was not inculpatory in nature). In these statements, appellant consistently placed the blame for the fire on Leah and Kelly. The evidence gained from appellant in these April statements added very little to the proceedings and, therefore, cannot be said to have contributed to his conviction. Fahy v. Connecticut (1963), 375 U.S. 85, 86-87. In addition, appellant's confessions during the June 2000 interrogations constituted overwhelming evidence of his guilt. Therefore, the admission of the April statements, even if in error, was harmless beyond a reasonable doubt.
Appellant next contends that his June confessions should also have been suppressed. The first confession, videotaped on June 16th, was taken after appellant was arrested for violating the terms of his probation. He was taken to the Columbus Police Department Headquarters and questioned by Detective Kallay. At this point, Detective Kallay admitted that appellant was now a suspect in this crime. Before being interrogated, appellant was apprised of his Miranda rights and he signed a document waiving those rights. The waiver also indicated that appellant had completed the tenth grade of high school, could read and write, and had not taken any drugs or alcohol that day. Likewise, on June 20th, appellant was again apprised of his Miranda rights before he made additional admissions.
Appellant contends that both of these June confessions were involuntary and the product of coercive police tactics. A confession is "voluntary if it is `the product of an essentially free and unconstrained choice by its maker[.]'" State v. Wiles (1991), 59 Ohio St.3d 71, 81, quoting Culombe v. Connecticut (1961), 367 U.S. 568. Evidence of police coercion or overreaching is necessary for a finding of involuntariness and not simply evidence of a low mental aptitude. State v. Eley (1996),77 Ohio St.3d 174, 178; see, also, Colorado v. Connelly (1986),479 U.S. 157, 164. There must not only be police misconduct, but such misconduct must have caused the defendant's confession. Id.
The question of whether a confession is voluntary is to be determined by looking at the "totality of the circumstances" under which the confession was made. State v. Slagle (1992), 65 Ohio St.3d 597, 600, quoting State v. Edwards (1976), 49 Ohio St.2d 31, 40-41. The court should consider such things as the individual's age, mentality and prior criminal experience; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. Id. In making this constitutional determination, we review the record independently as a matter of law. Cf. Edwards, supra; see, e.g., Boulden v. Holman (1969),394 U.S. 478, 480. However, the trial court's factual decision at a suppression hearing, which rests upon the credibility of witness testimony, is accorded "great deference." State v. Robinson (1995), Summit App. No. 16766; see, also, State v. Smith (1991), 61 Ohio St.3d 284,288.
Appellant claims that his June 16th confession was involuntary and the product of coercion because: (1) the officers did not stress the importance of his Miranda rights when appellant received the warnings; (2) the officers denied his request to use the telephone; and (3) the officers threatened him with felony charges if he did not cooperate. We disagree. These factors alone are not sufficient to render appellant's admissions involuntary given the totality of circumstances. This interrogation took place in a small conference room with appellant and two officers, Detective Kallay and Special Agent Ozbolt. The interrogation lasted almost two and one-half hours. There was no physical violence used or threatened during the interrogation and rarely did any of the people involved even raise their voices. Appellant was not in handcuffs during the interrogation. Appellant was almost 30 years old at the time. The videotape of the interrogation does not reveal an unduly coercive environment or improper police tactics.
Those in custody must be advised of their Miranda rights and understand those rights before being questioned. Miranda, supra. However, there is no requirement that police officers emphasize the significance or gravity of those rights. Appellant was read his rights and he stated that he understood those rights. In fact, he did not want the officers to read him his rights because he said he was already aware of them. Appellant had previous encounters with police officers and stated that he was familiar with his rights. The failure of the officers to stress the significance of these rights does not constitute coercive conduct and, thus, does not render appellant's admissions involuntary.
Likewise, the failure of the officers to allow appellant to use the telephone immediately after appellant made the request was not sufficiently coercive to overcome appellant's free will under the circumstances presented. Appellant requested to use the telephone within the first ten minutes of the interrogation but never repeated the request. Appellant did not indicate that he wanted to use the telephone to contact an attorney. Appellant did not ask to speak with an attorney. The officers told appellant that he could use the telephone as soon as they were done and appellant did not express any objection. These circumstances do not reflect coercive police conduct sufficient to overcome appellant's free will.
The alleged threat of a felony charge for failure to report on his recognizance bond was not a threat but a statement of fact. An arrest warrant had been issued that day for appellant's failure to comply with his release conditions. Therefore, the officers' statement that appellant might have another felony charge brought against him was not a threat, but a statement of fact. Although Detective Kallay indicated to appellant that, if he did not cooperate, he would be "going down" with Kelly and Leah as an accomplice, which would carry the same penalty as if he had thrown the Molotov cocktail himself, this single statement is not so coercive as to overcome appellant's free will and render his admission involuntary. United States v. Mendoza (C.A.8, 1996), 85 F.3d 1347, 1351
(citing cases for proposition that one single threat of future charges or imprisonment is not coercive).
Based on the totality of circumstances of the June 16th
interrogation, we find appellant's confession to be voluntary and not the product of police coercion. Therefore, the trial court did not err in allowing the videotape of the confession to be admitted as evidence at trial.
Appellant next claims that his June 20th confession was involuntary because he was again threatened with felony charges. Appellant claims that the threat of future charges for aggravated murder rendered his confession involuntary. As noted above, one statement of this nature is not sufficiently coercive, by itself, to render appellant's admissions involuntary. Id.
Finally, appellant argues that his June 20th confession was involuntary because the police used the possibility of a polygraph test as an improper inducement which they never fulfilled. We disagree. Appellant's failure to take the polygraph test was not the result of coercive activity by the police but, rather, was the consequence of appellant's own behavior. Walker testified that appellant refused to cooperate. Therefore, the polygraph test could not be administered. Appellant's lack of cooperation does not constitute coercion by the police. Connelly, supra.
Based on the totality of the circumstances of the June 20th
interrogation, we also find that appellant's confession was voluntary and not the product of police coercion. Therefore, the trial court did not err in admitting the videotape of the confession into evidence. Appellant's second assignment of error is overruled.
Appellant's fourth assignment of error alleges that the trial court erred in admitting his confessions absent evidence of the corpus delicti. We find no error. The corpus delicti rule requires that, before a confession to a crime may be admitted at trial, the state must first introduce evidence independent of the confession tending to establish the fact of death and the existence of the criminal agency of another as the cause of death. State v. Manago (1974), 38 Ohio St.2d 223,226-227; State v. Nobles (1995), 106 Ohio App.3d 246, 262. This requirement is minimal, requiring only "some" proof that a crime has been committed. State v. Maranda (1916), 94 Ohio St. 364, 371; State v. Smith (1996), 115 Ohio App.3d 419, 429. The evidence need not be strong enough that it would prove any element of the crime beyond a reasonable doubt. There just needs to be some evidence, direct or circumstantial, tending to prove the fact that a crime was committed. Maranda, supra; Nobles, supra.
Appellant does not contest the fact that Shenequa Bell died as a result of injuries she sustained in the fire. Even without appellant's admissions, there was evidence offered at trial demonstrating that a crime was committed sufficient to satisfy the corpus delicti rule. Battalion Chief Hackett testified that it was his opinion that the fire was intentionally set. Kenyon Beavers, the CFD dog handler, testified that his dog twice alerted to the presence of a flammable liquid. Finally, and most significantly, Billy Reedus, the CFD investigator, opined that the fire was intentionally set by a Molotov cocktail thrown through the front window. This is sufficient evidence to show that a crime was committed. While appellant argues that there is no evidence to link him to the crime other than his own admissions, such evidence is not necessary to comply with the corpus delicti rule. Nobles, supra. All that is required is some evidence to show that a crime has been committed. This rule was satisfied and, accordingly, appellant's fourth assignment of error is overruled.
Appellant's first assignment of error contends that the trial court erred in failing to inquire into defense counsel's alleged conflict of interest. At the hearing on appellant's motion to suppress, Detective Kallay testified that he went to talk to appellant on April 24th about the fire but, also, about an unrelated investigation of a man named Ronald Dawson. Appellant apparently gave Detective Kallay information that day which was later used to obtain a search warrant in the Dawson investigation. Appellant's counsel, Fred Benton, informed the court that he had represented Dawson in connection with that unrelated criminal matter. Neither Benton nor the prosecutor felt that Benton's prior representation of Dawson created a conflict of interest in this case. Nevertheless, the trial court informed appellant of his attorney's previous representation of Dawson. Appellant did not object or express any concern.
Appellant now alleges that the trial court erred in failing to inquire further into this alleged conflict of interest. We disagree. Where there is a right to counsel, the Sixth Amendment to the United States Constitution guarantees that representation will be free from conflicts of interest. State v. Gillard (1992), 64 Ohio St.3d 304, 312. "Unless the trial court knows or reasonably should know that a particular conflict exists, or unless the defendant objects to multiple representation, the court need not initiate an inquiry into the propriety of such representation." State v. Manross (1988), 40 Ohio St.3d 180,181, citing Cuyler v. Sullivan (1980), 446 U.S. 335, 347. "An attorney representing multiple defendants in criminal proceedings is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of the trial." Manross, supra, at 181-182.
The evidence of record in this case does not indicate that appellant's counsel had a conflict of interest or that the trial judge should have inquired further. Appellant's counsel previously represented another defendant in an unrelated criminal matter. That prior representation did not create a conflict of interest in appellant's case even if appellant provided information to police that led to the issuance of a search warrant in the other unrelated criminal matter. Benton felt there was no conflict of interest. When he raised the issue, Benton told the trial court that "my understanding is there is nothing about this case that relates to Mr. Dawson's case that I have a conflict. I don't believe that I do." We find that, given the facts described to the trial court, there was no possibility of a conflict of interest in Benton's representation of appellant to warrant further inquiry. State v. Dillon (1995), 74 Ohio St.3d 166, 169 (finding no duty to inquire into conflict of interest where no possibility of conflict existed given facts known to the trial court).
Because the trial court had no duty to inquire further into the alleged conflict of interest and appellant did not object at trial, appellant must demonstrate that an actual conflict of interest existed which adversely affected his lawyer's performance. Id., at 169; Cuyler, supra, at 348. An "actual, relevant conflict of interests" exists "if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue." Id. at 356, fn. 3 (Marshall, J., concurring in part and dissenting in part). In such a case, counsel's duty to one client "tends to lead to disregard for another." Manross, supra, at 182.
As noted above, appellant has failed to identify an actual conflict of interest. Appellant simply does not set forth any facts supporting an actual conflict of interest under which Benton labored in representing appellant. The mere fact that Benton represented Dawson in a previous, unrelated case does not, without more, demonstrate an actual conflict of interest. Appellant's first assignment of error is overruled.
Appellant's third, seventh and eighth assignments of error all involve the admission of evidence. The admission of evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. State v. Martin (1985), 19 Ohio St.3d 122, 129. An abuse of discretion connotes more than a mere error of judgment; it implies a decision is without a reasonable basis and one that is clearly wrong. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Appellant's third assignment of error contends that the trial court erred in admitting certain testimony from Battalion Chief Hackett and Investigator Reedus. In his testimony, Battalion Chief Hackett was asked how fast a fire could consume a house. In response, Battalion Chief Hackett testified that:
 UNSCIENTIFICALLY, FIRE DOUBLES IN SIZE EVERY MINUTE THAT IT IS ALLOWED TO BURN. SO WITHIN A MATTER OF MOMENTS, SPECIFICALLY GIVEN A FLAMMABLE LIQUID THAT CAN, YOU KNOW, INITIALLY BURST INTO FLAMES OVER A LARGE AREA, AS YOU START TO ADD MOMENTS TO THAT, THAT FIRE DOUBLES IN SIZE VERY QUICKLY. AND BEFORE LONG, WITHIN A MINUTE OR TWO MINUTES, IT COULD BE OUT OF CONTROL.
Appellant's counsel objected to that testimony, claiming that there had been no evidence presented establishing the presence of flammable liquids. The court overruled the objection.
The trial court did not abuse its discretion by permitting this testimony. Battalion Chief Hackett had already testified that the fire had flashed back when initially hit with water, which indicated to him that a flammable liquid was involved. Therefore, there was previous testimony regarding the possible presence of an accelerant. In addition, there was a great deal of testimony from subsequent witnesses indicating the presence of an accelerant. We find that the trial court did not abuse its discretion in admitting this testimony.
Appellant also contends that the trial court erred in admitting, over objection, Investigator Reedus' expert opinion that the fire was caused by a Molotov cocktail. Reedus testified that he had been a fire investigator for fourteen years. Prior to that, he was a fireman for six years. After deciding to become an investigator, he trained for three weeks at the National Fire Academy and has attended numerous fire investigation seminars since that time. He also obtained an Associate Degree in Fire Science from Columbus State.
After eliminating accidental causes of fire, such as electrical and weather, and after analyzing the charring pattern of the fire, Reedus concluded at the scene that this fire was intentionally set. Reedus testified that the pattern of charring was wider at the base than normal. He attributed this to the presence of an accelerant at the base of the fire. Additionally, the shiny charring present, which he referred to as alligatoring, pointed to the presence of an accelerant. Because the point of origin was right below the large window in the living room, Reedus concluded that something came in through that window, a Molotov cocktail, to ignite the fire. Although he testified that he could not find any physical evidence of a Molotov cocktail, he found glass from the window inside the house, indicating to him that something had been thrown from outside the house, forcing the glass into the house.
Reedus expressed his opinion to a reasonable degree of scientific certainty. In reaching his opinion, he relied upon his training, eyewitness accounts, his physical investigation of the site, and the fact that the dog alerted to the presence of an accelerant. He discounted the fact that test samples failed to indicate the presence of an accelerant, noting that they might have missed the exact location or there might not have been enough accelerant in the sample that was tested.
The admission of expert testimony is within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. State v. Williams (1996), 74 Ohio St.3d 569, 576. An abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Reiner (2000), 89 Ohio St.3d 342, 356.
In determining whether the testimony of an expert witness was proper, we must consider Evid.R. 702, which governs the admissibility of expert testimony. That rule provides:
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information, To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
In State v. Nemeth (1998), 82 Ohio St.3d 202, the Supreme Court of Ohio explained that "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The credibility to be afforded these principles and the expert's conclusions remain a matter for the trier of fact." Id. at 211. Thus, the reliability requirement under Evid.R. 702 "is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." Id.
Appellant does not contest Reedus' expert qualifications. Rather, appellant contends that his testimony did not comply with Evid.R. 702 because it was not based on reliable information and there was no evidence of the theory employed by Reedus that could be objectively verified. We disagree. Reedus' conclusion was based on valid and reliable information resulting from an adequate investigation. He testified that he based his conclusion on his training, his investigation of the scene, the dog's primary alerts, and his elimination of other causes. This is reliable information sufficient to support the admissibility of his testimony. State v. Campbell (2002), Hamilton App. No. C-010567 (finding arson investigators' testimony regarding origin of fire admissible); State v. Hinkle (1996), Portage App. No. 95-P-0069 (affirming admissibility of arson investigators' conclusion of cause of fire).
Reedus' opinion was not based upon the result of a test or procedure. Therefore, compliance with Evid.R. 702(C)(1), (2) and (3) is not required. The absence of objective evidence indicating the presence of a Molotov cocktail goes to the weight of Reedus' testimony rather than to its admissibility. Cf. State v. Funk (2001), Franklin App. No. 00AP-1352. The trial court did not abuse its discretion in admitting Reedus' expert testimony.
To the extent appellant argues that the trial court erred in admitting testimony from dog handler Beavers, counsel failed to object to this testimony and, thus, has waived all but plain error. Plain error exists where the outcome of the trial would clearly have been different but for the error. State v. Biros (1997), 78 Ohio St.3d 426, 431. The plain error rule must be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. State v. Cooperrider (1983), 4 Ohio St.3d 226, 227. Even without Beavers' testimony, there was other evidence that an accelerant was used to start the fire. Therefore, we cannot say that the outcome of the trial would clearly have been different had this testimony been excluded. Accordingly, the trial court did not err in admitting Beavers' testimony. Finding no abuse of discretion by the trial court in admitting this testimony, appellant's third assignment of error is overruled.
Appellant's seventh assignment of error contends that the trial court erred in admitting hearsay testimony without a showing that the declarant was unavailable. Specifically, Detective Kallay testified that he had a conversation with a man named Adiyat Diggs and, based on that conversation, he wanted to talk to appellant about the fire. Evid.R. 801 and 802 forbid the introduction of out-of-court statements offered to prove the truth of the matter asserted. However, the testimony appellant objects to did not include any statement made by Diggs offered to prove the truth of a matter asserted. The conversation with Diggs was only introduced to explain why Detective Kallay originally went to talk with appellant. Nor did Detective Kallay's testimony about the conversation with Diggs implicate appellant in the crime. See State v. Prade (2000),139 Ohio App.3d 676, 691, 693, citing State v. Maurer (1984),15 Ohio St.3d 239, 262. Therefore, the trial court did not abuse its discretion by admitting Detective Kallay's testimony about his conversation with Diggs. Appellant's seventh assignment of error is overruled.
In his eighth assignment of error, appellant contends that the trial court erred in failing to declare a mistrial when the prosecutor displayed a post-fire photograph of Elijah Bell to the jury during closing argument. To the extent appellant argues that the photograph should not have been admitted as evidence in the first place, the decision to admit photographs is a matter which lies within the sound discretion of the trial court. State v. Jalowiec (2001), 91 Ohio St.3d 220,229. The photograph was admitted without objection. Therefore, appellant has waived all but plain error in the admission of this photograph. As noted earlier, plain error exists where the outcome of the trial would clearly have been different but for the error. Biros, supra, at 431. We cannot say that the outcome of this trial, given all the evidence in this record, would have been different had this one photograph not been admitted into evidence.
To the extent appellant argues the trial court should have granted his later motion for a mistrial based on the prosecutor's display of this photograph to the jury, a decision to deny or grant a mistrial is within the trial court's discretion, "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." State v. Stanley (1997), 121 Ohio App.3d 673, 699, citing State v. Glover (1988),35 Ohio St.3d 18, 19. This court will not reverse the trial court's decision unless the trial court abused its discretion.
The photograph of Elijah Bell in question was not inflammatory or gruesome. It is a picture of a smiling young boy obviously taken sometime after the fire. We find no abuse of discretion in the court's denial of appellant's request for a mistrial. While appellant now argues that a limiting instruction should have been given to the jury, appellant made no such request to the trial court at the time the photograph was admitted into evidence, and it would be difficult to imagine that the absence of such an instruction made a difference in the jury's verdict. Slagle, supra, at 609 (failure of trial court to give limiting instruction not plain error). Appellant's eighth assignment of error is overruled.
Appellant's ninth assignment of error contends that the trial court erred in giving a limiting instruction to the jury regarding evidence of appellant's prior drug use and incarcerations. Appellant does not contend that the admission of that evidence was error. Rather, appellant argues that the trial court's limiting instruction constituted error under Evid.R. 404(B).
It is well-established that a trial court has broad discretion in instructing the jury. State v. Smith (2002), Franklin App. No. 01AP-848. In its instructions to the jury, the trial court in this case informed the jury that evidence of appellant's drug use and previous incarceration was introduced for a limited purpose. "It was not received and you may not consider it to prove the character of [appellant] in order to show that he acted in conformity with that character. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent or identity. However, that evidence cannot be considered for any other purpose."
Appellant contends that the evidence of his drug use and previous incarcerations was not relevant to any of the permissible purposes identified in the limiting instruction and, therefore, the trial court erred in giving the instruction. Again, we disagree. The evidence of appellant's prior drug use was arguably relevant to both motive and intent. Appellant's own statements disclosed that he received drugs from Leah both before and after the crime was committed. This might suggest a reason why appellant participated in the crime. Admittedly, evidence of his drug use and previous incarcerations were not relevant to the other purposes referred to in the limiting jury instruction opportunity and identity. However, these purposes were not at issue in appellant's trial. Therefore, any reference to these purposes in the trial court's limiting instructions was not prejudicial to appellant.
The evidence of appellant's prior incarceration was introduced only to explain the circumstances of his first conversation with police about the fire. Furthermore, the portion of the April 24th statement, which disclosed why appellant was in prison, was left in the audiotape at appellant's request. Presumably, this was a tactical decision by appellant's counsel to inform the jury why appellant was in jail so they would not think he had been convicted of a more serious crime.
The trial court acted within its discretion in providing a limiting instruction to the jury regarding appellant's prior incarceration. The trial court chose to give a limiting instruction to the jury so that it would not view appellant's prior incarceration as proof that he committed this crime. A jury is presumed to follow the instructions given it by a trial judge. State v. Garner (1995), 74 Ohio St.3d 49, 59. Therefore, the trial court's limiting instruction as it related to appellant's prior incarceration was not an abuse of discretion. Appellant's ninth assignment of error is overruled.
Appellant's sixth assignment of error contends that the trial court erred in denying his motions for judgment of acquittal. Crim.R. 29(A). Such a motion requires a court to enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. In ruling on a motion for judgment of acquittal, the court is required to construe the evidence most strongly in favor of the state, the party against whom the motion has been directed. State v. Ellis (1996), Franklin App. No. 96APA02-188; State v. Fyffe (1990), 67 Ohio App.3d 608, 613. An entry denying the motion is proper if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v. Grinnell (1996), 112 Ohio App.3d 124, 137; State v. Wolfe (1988),51 Ohio App.3d 215; State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. Thus, a Crim.R. 29(A) motion for acquittal "should be granted only where reasonable minds could not fail to find reasonable doubt." State v. Apanovitch (1987), 33 Ohio St.3d 19, 23, citing Bridgeman, supra.
Although at trial, appellant's motions sought acquittal on the entire indictment, he now argues that the trial court erred in failing to grant acquittal only on the two aggravated murder counts and the death penalty specification. Appellant contends that the evidence presented was insufficient to prove that he acted purposefully or with intent to cause the death of any specific person.
Purpose is an essential element of both aggravated murder and murder, as well as the relevant death penalty specification. Purpose is defined in R.C. 2901.22(A):
 A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish, thereby, it is his specific intention to engage in conduct of that nature.
Appellant argues that the evidence presented demonstrates, at best, that his intention was to burn the house but not to kill anyone in the house. Moreover, appellant asserts there was no evidence that he knew more than one person lived at the house on 151 South Wheatland Avenue.
Purpose, or intent, can be established by circumstantial evidence. State v. Jenks (1991), 61 Ohio St.3d 259, 272. The intent to kill need not be proved by direct testimony, but may be deduced from the surrounding circumstances, including the means or weapon used, its tendency to destroy life if designed for that purpose, the manner in which the wounds are inflicted, and all other facts and circumstances in evidence. State v. Robinson (1954), 161 Ohio St. 213, 218-219; State v. Burke (1995), 73 Ohio St.3d 399, 404; State v. Busby (1999), Franklin App. No. 98AP-1050.
A person is presumed to intend the natural, reasonable, and probable consequences of his acts. State v. Johnson (1978), 56 Ohio St.2d 35,39. Additionally, where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. State v. Jester (1987), 32 Ohio St.3d 147, 152. Such evidence is sufficient to allow a jury to find intent to kill. Id. Recently, the Ohio Supreme Court also noted that "participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." State v. Johnson (2001), 93 Ohio St.3d 240, 245; see, also, State v. Conley (1998), Franklin App. No. 97AP-701.
Appellant's admissions establish that he and Kelly met with Leah on October 26, 1997, the day before the fire. Leah told appellant that he was going to be driving Kelly somewhere later that day. He also heard her say that she wanted the house blown up. She showed them how to make a Molotov cocktail and gave them money to go to a gas station where they filled up bottles with gas. When they were in appellant's car, appellant watched Kelly tear cloth strips to use as wicks for the Molotov cocktail, as he uttered words to the effect of "I'm gonna blow that bitch up." After the fire, appellant drove Kelly away from the house and later met with Leah, where they received more drugs.
When viewed most strongly in favor of the state, the evidence at trial established, at a minimum, that appellant assisted Kelly by driving him to the house to throw the Molotov cocktail. At most, it showed that appellant was involved with the planning and execution of the arson. As an accomplice, appellant can be held criminally liable as if he was the principal offender and is criminally culpable to the same degree as the principal offender. State v. Moore (1985), 16 Ohio St.3d 30, 32-33. The use of a Molotov cocktail under these circumstances is sufficient to allow the jury to infer the required intent to kill. Jester, supra. The natural and probable consequence of throwing a Molotov cocktail into a house in the early morning hours is to start a fire that could cause the death of any occupants in the house.
The evidence, viewed most favorably to the state, demonstrates an intent to kill Aleta Bell by throwing a Molotov cocktail into her house. Merely because Shenequa, and not Aleta Bell, died does not alter the purpose of this criminal offense. Under the "transferred intent" doctrine, "the culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim. Therefore, * * * if one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder." State v. Solomon (1981), 66 Ohio St.2d 214, 218; see, also, State v. Robinson (1999), 132 Ohio App.3d 830, 839; State v. Richey (1992),64 Ohio St.3d 353, 363-364. Because the intent of this plan was to kill Aleta Bell, that intent transfers to the death of Shenequa. The nature of the act does not change simply because someone other than the intended target died.
Because the evidence before the trial court, when viewed in a light most favorable to the state, is sufficient to support the verdict, the trial court did not err in denying appellant's Crim.R. 29 motion. Therefore, appellant's sixth assignment of error is overruled.
Appellant's fifth and tenth assignments of error contend that he received ineffective assistance of counsel. In order to prevail on an ineffective assistance of counsel claim, appellant must meet the two-prong test enunciated in Strickland v. Washington (1984), 466 U.S. 668; accord State v. Bradley (1989), 42 Ohio St.3d 136, certiorari denied (1990), 497 U.S. 1011. Initially, appellant must show that counsel's performance was deficient. To meet that requirement, appellant must show counsel's error was so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. Appellant may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690.
If appellant successfully proves that counsel's assistance was ineffective, the second prong of the Strickland test requires appellant to prove prejudice in order to prevail. Id. at 692. To meet that prong, appellant must show counsel's errors were so serious as to deprive him of a fair trial. Id. at 687. Appellant would meet this standard with a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
In the tenth assignment of error, appellant first contends that trial counsel was ineffective for failing to object to the jury's request to review again the videotaped confessions during its deliberations. Ohio courts follow the majority rule, which permits the replaying of a videotape exhibit during jury deliberations. State v. Loza (1994),71 Ohio St.3d 61, 79. There is no prejudicial error in the jury's viewing a second time an exhibit properly admitted into evidence. State v. Clark (1988), 38 Ohio St.3d 252, 257. Generally, the propriety of sending a defendant's confession into the jury room rests within the sound discretion of the trial judge. State v. Doty (1916), 94 Ohio St. 258,266-267.
A trial court has discretion to allow the replaying of videotapes to the jury. Therefore, we reject the proposition that counsel provided ineffective assistance by failing to object to the replaying of the videotape. State v. Callahan (2000), Mahoning App. No. 97 CA-224 (finding counsel's failure to object to replay of videotape not ineffective assistance). The likelihood of the trial court sustaining an objection to the replaying of these videotapes was minimal at best. State v. Robertson (1993), 90 Ohio App.3d 715, 730 (no ineffective assistance of counsel for failure to object to evidence when objection likely to have been overruled). Appellant's tenth assignment of error is overruled.
Appellant's fifth assignment of error contends that trial counsel was ineffective for failing to call an expert witness in the field of false confessions. However, the record is silent as to what testimony such an expert would have given at trial. Appellant's attachment to his appellate brief of a journal article on false confessions cannot be considered by this court. Because appellant's claim necessarily relies on evidence outside the record (i.e., an expert witnesses' potentially favorable testimony), the claim is not properly raised on direct appeal. State v. Aeh (1997), Franklin App. No. 97AP-601; State v. DeLeon (2001), Montgomery App. No. 18114. Therefore, appellant's fifth assignment of error is overruled.
Finally, appellant's eleventh assignment of error contends that the trial court failed to make the required findings in sentencing appellant to maximum and consecutive sentences, and that the trial court improperly punished appellant for proceeding to a jury trial by imposing the maximum sentence.
On the day of sentencing, the trial court asked appellant if he had anything to say. When he answered in the negative, the trial court then asked, "You rolled the dice, didn't you?" Appellant contends that this statement indicates the trial court intended to punish appellant for going to trial. However, this single comment is insufficient to indicate the trial court's intent. It just as easily could be interpreted as the trial court expressing empathy with appellant's decision to go to trial, but ultimately losing. Therefore, we find no evidence of an improper motive by the trial court in sentencing appellant.
However, the state concedes that the trial court failed to make the required findings to impose maximum and consecutive sentences. Therefore, the proper remedy is to remand this case to the trial court for resentencing in compliance with the appropriate sentencing requirements. Therefore, appellant's eleventh assignment of error is sustained.
In conclusion, having overruled appellant's first ten assignments of error, but having sustained appellant's eleventh assignment of error, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court for resentencing in compliance with the appropriate sentencing requirements.
Judgment affirmed in part, reversed in part and cause remanded.
BOWMAN and BROWN, JJ., concur.
[1] Leah was Leah Smith, a former friend of Aleta Bell who lived in the other half of the house at 151 South Wheatland Avenue. Days before the fire, Leah had moved out of the house. The two had been involved in a dispute earlier in the summer of 1997, when Aleta Bell accused Leah of forging a driver's license with Aleta's personal information but with Leah's picture. When Aleta found the driver's license, she took it back. Leah later broke into Aleta's home and stole the driver's license. Leah was charged with and pled guilty to one count of burglary arising from that incident.